[No. 21.    Second Appellate District.—July 20, 1905.]

ALEXANDER McRAE, Respondent, v. CHARLES ER-ICKSON et al., Appellants.

Negligence—Master and Servant—Injury of Servant in Railroad Tunnel—Instruction—Completed Part of Tunnel—Appliance —Safety.—Where the plaintiff was injured while working in a railroad tunnel from the falling of a rock from the side of a track laid therein, it was proper in effect to instruct the jury that where a permanent tunnel is being driven into a mountain to furnish a permanent bed for a railroad, the completed portion of the tunnel in which substantially all the work of excavation is performed, in

order to render the tunnel of the size and capacity provided for in the plans and specifications, becomes an appliance and means furnished by the master by which the remaining work is to be prosecuted, and if so completed the employees of the defendants were obligated to use ordinary care to render such completed portion a safe place in which to work, and to keep it in a condition reasonably fit.

Id.—Completion to Temporary Grade of Track.—The excavation of the tunnel to the temporary grade of a track laid therein was a substantial completion of that portion of the tunnel.

Id.—Contributory Negligence—Imminent Danger—Instruction—Choice of Wrong Direction.—Where there was no evidence to show that the plaintiff was brought into his dangerous position by any negligence of his own, it was proper to instruct the jury in effect that a person in imminent danger is not called upon to exercise that intelligence and judgment he would be expected to exercise were he not in danger, and that if plaintiff found himself in imminent danger and had not time to stop and consider and determine the better course to pursue, his choosing to run out toward the portal instead of back toward the bend was not negligence on his part, even though in so doing he may have run right under the falling rock instead of away from it.

Id.—Negligence a Question of Fact.—The question of negligence is commonly a question for the jury, and it is only in extreme cases that this court would be justified in disregarding the verdict of the jury.

Id.—Evidence—Privileged Communications—Physician and Patient.—A physician in charge of defendant's hospital whose services were remunerated by assessments upon the wages of the men employed was in effect employed by the plaintiff, and answers made by the plaintiff to questions asked of him by the physician as to how the injury was sustained, for the purpose of determining his condition as preliminary to treatment, were privileged communications.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. M. T. Allen, Judge.

The facts are stated in the opinion of the court.

Bicknell, Gibson & Trask, for Appellants.

Fred E. Burlew, and Edwin A. Meserve, for Respondent.

SMITH, J.—Appeal from a judgment for the plaintiff, and from an order denying the defendants' motion for a new trial. The suit is for damages for injuries received by plain-

tiff while working for defendants in the construction of a tunnel for the Southern Pacific Railroad Company on the line between Los Angeles and Ventura counties. The general course of the tunnel is eastward from the portal, or entrance to it. The work had been completed and permanently timbered some distance into the mountain, and for some distance beyond that—variously stated, but which we may call about fifty feet—the tunnel had been completed, with the exception of timbering, down to what may be called the "temporary grade." Over this there was laid a temporary track, reaching to the end, or "toe," of what is called by the witnesses the 'muck pile''—a point distant about eighteen feet from the face of the tunnel—by which is meant the cross-section of the tunnel at the end of the part above described. The precise difference of level between the regular grade and the temporary grade is not stated, but was probably a few inches only; and, in the language of one of the witnesses, this portion of the tunnel had been completed, except for the timbering, and "taking up the grade"; by which is meant, completing the excavation to the regular grade.

At the time of the accident the plaintiff was engaged on the south side of the tunnel in loading a car from the muck heap, and was injured by a rock falling from the side of the tunnel between him and the portal as he attempted to escape in that direction.

The jury were instructed (among other instructions), in effect, that where a permanent tunnel is being driven into a mountain to furnish a permanent bed for a railroad, the completed portion of the tunnel, as fast as completed, becomes an appliance and means furnished by the master, by which the remaining work is to be prosecuted; and that if the jury found that any portion of the tunnel was thus completed, the employees of defendants were obligated to use ordinary care to render such completed portion a safe place in which to work, and to keep such completed portion in a condition reasonably safe, etc. And in definition of the terms used, it is added by the court: "When I say 'completed,' I desire to be understood as saying, when substantially all the work of excavation is performed, in order to render the tunnel of the size and capacity provided for by the plans and specifications."

This instruction was based upon the decision in *Hanley* v. *California Bridge etc. Co.*, 127 Cal. 232, [59 Pac. 577] ; and one of the points urged by the appellants is, that "the tunnel at the point from where the rock fell was uncompleted," within the sense of the term used in the instruction, and in the case cited. But we are of the opinion that the excavation of the tunnel to the temporary grade was a substantial completion of that portion of the tunnel, within the meaning of the instruction, and within the reason of the decision.

Another objection urged by the appellants was to the following instruction: "When a person is in imminent danger, he is not called upon to exercise that intelligence and judgment he would be expected to exercise were he not in danger. So if a party in imminent danger has two ways open to him, but has not the time to stop and investigate, and determine which is the right or safe way, and which is the wrong or unsafe way, his choosing the latter is not, under the circumstances, negligence on his part. So, if you should find from the evidence in the case that McRae found himself in imminent danger or had reasonable ground to believe that he was in such danger, and had not time to stop and consider and determine the better course to pursue, then you are instructed that his choosing to run out toward the portal instead of back toward the bench was not negligence on his part, even though in so doing he may have run right under the falling rock instead of away from it."

The objections urged to this instruction are that it should be qualified with the provisos: That plaintiff acted in the emergency as any ordinarily prudent man would have been likely to act under the same circumstances, and that the dangerous situation was brought about by the plaintiff's negligence. But with regard to the latter qualification, there was no evidence in the case tending to show that the plaintiff was brought into his dangerous position by any negligence of his own; and from the evidence and the verdict, it must be assumed that the situation was the result of the negligence of the defendants. Nor are we prepared to hold, in the absence of negligence on the part of the plaintiff, that it is a material question whether the dangerous situation of plaintiff was the result of defendants' negligence, or otherwise.

We are also of the opinion that the other qualification contended for by appellants is equally untenable. The principle expressed in the instruction is based upon the familiar and well-known fact that in circumstances of imminent danger the ordinarily prudent man commonly acts without prudence, and that it is only the exceptional man who can be relied upon, under such circumstances, to retain his presence of mind. Or, in other words, the rule is based on an almost universal human infirmity.

It is objected, also, that the evidence was insufficient to justify the verdict, in that it affirmatively appears that the defendants were not guilty of negligence, and that the plaintiff was guilty of contributory negligence. But the question of negligence is commonly a question for the jury, and it is only in extreme cases (of which this is not one) that this court would be justified in disregarding the verdict. It may be added that the only claim of contributory negligence is that when the imminence of the danger from the falling rock became apparent, the plaintiff, like the other employees present, attempted to escape in the wrong direction.

The remaining point urged is, that the court erred in excluding the testimony of Dr. Hitt as to a statement made to him by the plaintiff at the defendants' hospital, where he had been taken for treatment; and this is objected to on the two grounds: That there is nothing in the record to indicate that the witness was acting professionally, or with a view to treating plaintiff, or that the information was obtained with a view to treatment; and that the information was, in fact, not "necessary to enable him to prescribe or act for the patient."

But the former point, we think, is obviously untenable. The witness was a physician and surgeon, and as such was in charge of the defendants' hospital, and his services were remunerated by assessments upon the wages of the men; so that he was in effect employed by the plaintiff. He examined the plaintiff as a physician, and the plaintiff knew that he was examining him as such, and the information sought was obtained from the plaintiff at the time he was examining him, or some time during the day. The court below, we think, was right in holding that the communication was made to the witness in the course of professional employment.

As to the remaining objection. The question asked the witness was: "If Mr. McRae made any statement to you, explaining how the rock fell and how it hit him," to which he answered: "He did." The witness was then asked: "Now, state whether he told you how the rock came down and from whence it came"; and the question being objected to, the witness testified that the statement referred to "had nothing to do with his [the plaintiff's] treatment, nor with the examination of him for the purpose of determining his physical injuries"; that "it had no relation whatever to his treatment"; that "it was customary in the hospital to get a record from the patients as to how these things occurred." The witness was then asked by the court: "Was it a part of the history of the case," etc. To which he answered: "Why, I simply asked him how it occurred—how did you get this injury—no matter if it is a scalp wound, or mashed finger, or whatever it may be, it is natural to inquire how it occurred; and in connection with that he reported to me." The objection to the question was thereupon sustained, and the appellants excepted. The court was not informed as to the effect of the statement sought, otherwise than by the questions quoted above; and from these it cannot be very clearly determined what the statement would have been. If it was as indicated by the first question, the information sought was apparently of a character necessary to the proper treatment of the patient. But information as to the direction or point whence the rock came would seem to have been unnecessary for such purpose; and to this extent, if we have regard to the most obvious sense of the provision of the statute under consideration, the objection of the respondent would seem to have been well taken. But to give to the statute this narrow construction would equally exclude from its application many if not most of the answers to questions usually put, and properly and necessarily put, by competent physicians to patients in cases of this kind, in order to enable them to act for their patients. This, we think, would be to defeat the obvious purpose of the act, which, it is said, "is to facilitate and make safe full and confidential disclosure by patient to physician of all facts, circumstances, and symptoms, untrammeled by apprehension of their subsequent and enforced disclosure and publication on the witness-stand, to the end that

the physician may form a correct opinion, and be enabled safely and efficaciously to treat his patient." (*Will of Bruendl,* 102 Wis. 47, [78 N. W. 169].) Hence, it is said in the case cited (which is also cited by the appellants): "The seal placed on the lips of the physician only relates to 'information necessary to enable him to prescribe for such patient as a physician.' The tendency of all courts has been and should be toward liberal construction of these words to effectuate the purpose of the statute. Thus, it has been held that the word 'necessary' should not be so restricted as to permit testimony of statements or information in good faith asked for or given to enable intelligent treatment, although it may appear that the physician might have diagnosed the disease and prescribed for it without certain information, so that it was not strictly necessary. (*Sloan* v. *New York Central R. R. Co.,* 45 N. Y. 125; *Grattan* v. *Metropolitan Life Ins. Co.,* 80 N. Y. 281, [36 Am. Rep. 617] ; *Renihan* v. *Dennin,* 103 N. Y. 573, [57 Am. Rep. 770, 9 N. E. 320].)'' In the case cited, under this liberal construction of the act, the testimony of physicians was admitted upon the ground that the examination of the patient was not made for the purpose of prescribing for her, the court saying: "We hold, therefore, that the information obtained by the physicians at the interview of September 18, 1896, was not necessary, and was not obtained, for the purpose of enabling them to prescribe for the testatrix as physicians." Though the precise question has not been determined by the supreme court of this state, the same view seems to have been commonly taken. Thus, in the case of *Freel* v. *Market St. Cable Ry. Co.,* 97 Cal. 46, 47, [31 Pac. 730], the testimony of a medical witness as to "information acquired by him . . . while visiting and prescribing for" plaintiff was excluded. So in *Harrisson* v. *Sutter St. Ry. Co.,* 116 Cal. 166, [47 Pac. 1019], the opinion of the physicians, "based upon facts ascertained by them during such medical attendance," was excluded; and so *Estate of Nelson,* 132 Cal. 187, [64 Pac. 294], there is a like ruling as to information of a physician "acquired by him from the decedent, and from observing him while he was in attendance upon him for the purpose of prescribing for him as his physician."

We are therefore of the opinion that the view of the court below in this case was correct, and that the intention of the

statute is to exclude all statements made by a patient to his physician while attending him in that capacity for the purpose of determining his condition. Nor does this construction do violence to the language of the act liberally construed; which we think is to be understood as forbidding a physician to be examined "as to any information acquired in attending the patient, *the acquisition of* which was necessary (or which it was necessary for him to acquire) *in order* to enable him to prescribe or act for the patient." Of this necessity, from the nature of the case, the physician must commonly be regar ᵈ as the sole judge; for it would be obviously unreasonable to require of the patient the exercise of any judgment with reference to the propriety of the questions asked by his physician, except, possibly, in cases where the materiality of the question is obviously apparent.

We are of the opinion that the judgment and order appealed from should be affirmed, and it is so ordered.

Gray, P. J., and Allen, J., concurred.