MISSISSIPPI POWER & LIGHT CO. v. JORDAN.

(Division B. October 10, 1932. Suggestion of Error Overruled Nov. 3, 1932.)

[143 So. 483. No. 30094.]

Green, Green & Jackson, of Jackson, and Hirsh, Dent & Sanders, of Vicksburg, for appellant.

Brunini & Hirsch, Thames & Thames, and **W. W. Ramsey**, all of Vicksburg, for appellee.

Argued orally by **R. L. Dent**, for appellant, and by **J. B. Brunini**, for appellee.

**Ethridge, P. J.,** delivered the opinion of the court.

Monk Jordan was employed by the Mississippi Power & Light Company in connection with the greasing and sanding of a portion of its street car tracks in the city of Vicksburg, and it was his custom to go from place to place on the street cars.

It was alleged by the plaintiff (appellee here), although it was disputed by the defendant's motorman, that Monk Jordan boarded the street car at the corner of Catherine and Poplar streets, a regular stopping place of the cars and a car having stopped there, to go to another place where his work called him, having with him his grease bucket, and that the motorman started the car off with a sudden and violent jerk and threw the

plaintiff (Jordan) to the floor and injured his leg; that his leg had been injured a good many years before this accident occurred, but that the injury had healed over and that he had been able, for a number of years, to do his work for the Mississippi Power & Light Company; and that the fall, resulting from the sudden jerk of the street car, bruised and injured his leg where the former injury had been, and that he had become totally disabled from further performing his work, and that it was possible that his leg would have to be amputated. His testimony as to how the injury occurred, that is, as to the suddenness of the starting of the street car, was supported by two negro boys who were playing near the track, and who testified in substantiation of Jordan's testimony. He was contradicted by the motorman and a negro woman who was on the car, she testifying that the plaintiff (Jordan), in stooping to put down his tar and bucket of sand, fell while the car was standing still, and that he stated, at the time, that his paralyzed leg gave way under him. The motorman testified that he started the car off gently, heard the fall, and looked around and then stopped the car, helped Jordan to his seat, and that Jordan stated that his paralyzed leg gave way.

The plaintiff (Jordan) testified that he went home after the injury and had his wife dress his leg, and that it was bruised by the fall and was bleeding some; that he went to a physician, and was by the physician sent to the hospital for treatment, where, the following day, the physician took instruments and chiseled or cut out some of the bone of his leg where the former injury was, and where the bruise of the present injury had been inflicted.

It appeared that the former injury had occurred many years ago, and that Jordan, at the time, was treated by one Dr. Johnson; that he was, at the time, for many months in the hospital, that the bones were split, and that it was feared that amputation would be necessary;

but, by long treatment, Dr. Johnson prevented amputation, and that, afterwards, the plaintiff was employed a number of years on the plantation of Dr. Johnson, but that some nine years ago, on account of high water or overflow, the plaintiff went to Vicksburg and secured employment from the Mississippi Power & Light Company, and from that time continued to perform the duties assigned to him by said appellant company.

The physician, Dr. Knox, who treated him at the time of the present injury, had a partner in practice who did not personally attend the plaintiff, but who visited the hospital and saw him and his condition, and this partner was offered as a witness to testify, as an expert, as to the condition he saw and as to the nature and character of the injury, and to testify that the condition Jordan's leg was then in could not have existed had not the leg been in a bad condition prior to that time.

The court refused to admit the proposed testimony of this partner of Dr. Knox, which constituted one of the assignments of error.

The appellant also offered Dr. Johnson, who had formerly treated Jordan's leg years ago, and attempted to prove by Dr. Johnson the nature and character of the injury, and sought to prove that the leg, during all the time Jordan was on the plantation, was in an unhealed condition and was kept bandaged. It appeared from Dr. Johnson's evidence, as well as from a ruling of the court, that he could not segregate his knowledge as a physician, from that he learned, not as a physician, in contact and association with Jordan. This evidence was also excluded.

It was the theory of the appellant that the injury was what is known as "osteomyolitis," or rotting of the bone, and that this condition had continued from the time of the prior injury to the present time.

The appellant introduced two other physicians as experts, who, from the facts disclosed in the evidence, testified that, in their opinion, the condition of the leg was

chronic osteomyolitis, and that it could not have been in that condition except from an injury of long standing, being full of pus. In other words, it was the opinion of these physicians that the leg was in a bad condition, not healed over, at the time of the injury, and that the injury which existed prior to the present injury was chronic, and that pus could not form between the time of the injury and the dressing of the leg at the hospital.

The appellant also offered to prove, by two trained nurses who attended the plaintiff, and attempted to qualify them as experts, that the disease was chronic in character. The court refused to admit them to testify as experts, but permitted them to testify as to the condition of the leg as they saw it, at the time it was dressed. It appears that one of the nurses dressed the injured leg at the time Dr. Knox attended Jordan, and she testified that there was a large hole in the leg and that a large amount of pus was taken from this hole at the time the plaintiff was brought to the hospital, and that this pus was offensive in odor and was yellow or greenish in color. She also testified that a large quantity of gauze was packed into the wound when it was dressed.

It is urged that it was error for the court to refuse to permit these nurses to testify as experts, and that their testimony was not privileged as to any feature of the case.

In our opinion, the physician who was a partner of Dr. Knox was, in contemplation of law, as much the physician of the patient as Dr. Knox, and that it was not competent for him to testify in the case any more than it was for Dr. Knox. Where two physicians are partners, patients are patients of the firm, and are entitled to advice and attention, and to have the privilege accorded by statute applicable to both of them.

Therefore, the court did not err in excluding this testimony.

As to the testimony of Dr. Johnson, it is clear that he could not segregate facts which he learned as a physi-

cian from facts learned in a personal capacity. The court correctly ruled that, as he could not so separate the facts in his mind, he was incompetent to testify, having formerly been the physician of Jordan, and having gained an extensive professional knowledge of his condition.

Inasmuch as the appellant secured the testimony of experts competent, whose competency is admitted, before a jury, there could be no prejudice as to the exclusion of the two other physicians who were offered.

The trial court must, necessarily to a large extent, be the judge, from an examination of the physician as to his ability as a physician, to separate knowledge he has obtained professionally from other knowledge. It certainly would be narrowing the purpose of the statute (Code 1930, sec. 1536) to permit a physician to testify as an expert who had attended a patient and who had gained an intimate knowledge of his condition under the confidence of a physician and a patient. In such case, he would, naturally, give testimony as an expert based, to a considerable extent, upon facts gained as the patient's physician. It would be an unsafe experiment in confidential relations to thus hazard or jeopardize such relations by this practice.

As to the testimony of the nurses, we are of the opinion that they did not qualify sufficiently to testify as experts, and could not do so from the mere training given nurses. In order to qualify as experts, there must have been not only training in different diseases and symptoms, but there must have been sufficient practical experience to enable them to discriminate between symptoms and conditions of different diseases.

We have heretofore held that a nurse is not a privileged witness as to what she sees and learns in her contact with patients, or as to communications made to her by patients; but we think where information and knowledge of a nurse are gained by being present and assisting a physician in treatment and hearing communica-

tions between the physician and the patient, then her testimony would be incompetent, for the reason that it is a part of the knowledge of the physician himself. A physician, in many cases, must have the assistance of a nurse or another physician where the work must be done quickly and skillfully, and to permit a nurse, under such circumstances, to testify as to facts or communications made to the physician by the patient, would be to annul the statute. As to all matters learned when not assisting a physician, a nurse is a competent witness.

We think the rule to be observed is stated by 5 Wigmore on Evidence (2 Ed.), par. 2381, where he states: "As with the other privileges, however, the privilege forbids compulsory disclosure by that person only to whom the confidence was extended. It, therefore, does not exempt a third person overhearing the communication, from testifying to it, *except so far as the third person is an agent of the physician.*" (Italics supplied.)

So far as the nurse was the agent of the physician in rendering him aid, and her presence being a practical necessity or a great convenience to the physician in the performance of his work, her testimony is no more available than the physician's; but when she learns privately from a patient, she is a competent witness to testify about same.

Wigmore, in the same work, in paragraph 2382, says: "A nurse, as an independent person, receiving medical confidences as such, is not within the privilege; but a nurse acting as the agent of a physician is within the privilege."

See, also, 4 Jones on Evidence, par. 759, p. 552; Cahen v. Continental Life Ins. Co., 41 N. Y. Super. Ct. 296; Springer v. Bryam, 137 Ind. 15, 36 N. E. 361, 23 L. R. A. 244, 45 Am. St. Rep. 159.

The views here expressed are not inconsistent with Goodman v. Lang, 158 Miss. 204, 130 So. 50, wherein the question was about the competency of a nurse as a witness as to whether or not a patient was drunk when

brought to the hospital. It was not a decision of a case where a nurse was the assistant of a physician or his helper at a time when he was diagnosing a case or communicating with a patient.

We find no reversible error, and the judgment of the court below is affirmed.

Affirmed.