[Civ. No. 8972. Second Appellate District, Division One.—March 20, 1935.]

JOHN KRAMER, Respondent, v. THE POLICY HOLDERS LIFE INSURANCE ASSOCIATION (a Corporation), Appellant.

Hugh Martin Young, Charles D. Warner and Thomas W. Hughes for Appellant.

David Kaufman and Leslie K. Floyd for Respondent.

ROTH, J., *pro tem.*—Respondent, as plaintiff in the trial court, recovered judgment on an insurance policy. During the course of the trial, respondent moved to strike and the court granted the motion striking the testimony of one Dr. Roland H. Harris, called as a witness by appellant. The correctness of this ruling is attacked on this appeal, which is from the judgment.

Respondent was the beneficiary of an insurance policy in which his deceased wife was the insured. In making application for the policy on February 2, 1930, in response to appropriate questions in the application, deceased stated that she had consulted a doctor within three years for a minor operation on the breast, but had fully recovered from such operation and that her present state of health was good.

Relying upon the truth of these and other representations made in the application, the policy was issued on February 5, 1930. The insured died on August 29, 1931.

On July 2, 1930, the insured visited the Coffey-Humber Clinic maintained by the W. K. Kellogg Foundation at Boyle and Michigan Avenues in the city of Los Angeles. At that time and place Dr. Harris, in the presence of his stenographer, took the patient's history and made a physical examination. From the patient he learned, among other things, that between the 11th and the 24th of December, 1929, less than two months before the acceptance of her application for insurance, her right breast had been removed because of cancer. Also that, at the time of the removal of the right breast, she was informed by the doctor that there was already a tumor of the left breast, and many other facts as to her previous state of health. The physical examination revealed to the doctor that the insured had an extensive spread of cancer originating in the right breast which, in his opinion, had been in existence in her system for in excess of two years.

The testimony of Dr. Harris as to what he learned in taking the patient's history and making his examination was received subject to appropriate and seasonable objection, and subsequently on motion was stricken from the record. It is the only testimony upon which findings could be predicated that the representations made by the insured in her application for insurance were false and untrue and known to her to be so.

Obviously the answer to the question presented is to be determined by whether or not subdivision 4, section 1881, Code of Civil Procedure, applies to Dr. Harris and the insured. If the insured was the patient of Dr. Harris and he acquired the information to which he testified in attending the patient, and such information "was necessary to enable him to prescribe or act for" the patient (subd. 4, sec. 1881, *supra*), then, unless there was an actual or implied waiver of the privilege, the evidence was clearly inadmissible, and the ruling of the trial court on the motion to strike was proper.

The Coffey-Humber Clinic was a free clinic. According to Dr. Harris, he was presented to the insured as Dr. Harris—"She knew me as Dr. Harris connected with Kel-

logg's Foundation. . . . She made an appointment to see me there (the clinic) through my stenographer, or the woman who kept the registry of all the patients; there was a book in which such appointments were made, and I saw four or five or six patients each afternoon from Monday to Friday."

Dr. Harris testified, and it appears to be the fact, that "I was there as an observer and took no responsibility as to the treatments of these patients. . . . I was there simply as the personal representative of Mr. W. K. Kellogg, who donated the funds. I was there to assist the W. K. Kellogg Foundation in observing 400 or more patients there, so as to be able to make a report at the end, as to the findings on the efficacy of the Coffey-Humber extract." The salary of Dr. Harris was paid by W. K. Kellogg personally. The funds necessary for the clinic to operate were supplied by the W. K. Kellogg Foundation.

Testifying specifically as to whether he examined Mrs. Kramer intending to prescribe for her, he said: "No, it was not; my intention was simply to determine her condition at that date, so as to be able at some later date to re-examine her and compare with the findings made on the first date."

It is further established that "all of the injections (which comprised the whole treatment at the clinic) were made by Doctors Coffey and Humber"; and that "no one connected with the W. K. Kellogg Foundation ever had a drop of that medicine to administer or ever did administer it". It is also established without dispute, that Dr. Harris, pursuant to an appointment with the insured, took her history in the presence of his stenographer, after which he told her that he wanted to make a physical examination, and that he would have his stenographer assist in getting her ready for the examination. He said nothing to the patient about the purpose of examination or whom he was representing, and she said nothing to him on the subject.

The originals of all records made by Dr. Harris were kept by himself. A copy went to the files of the W. K. Kellogg Foundation, and another copy went into the files of the Central Coffey-Humber Clinic.

With reference to the stenographer, the uncontradicted testimony of Dr. Harris was: "I . . . called my stenographer to stay when I began my examination. The stenog-

rapher got the patient ready, took off her waist, so as to get at her chest, and the stenographer was there during the entire examination and took all that I discovered in shorthand.''

The stenographer, like the doctor, was not in the employ of the clinic, but, unlike the doctor, was in the employ of the W. K. Kellogg Foundation, instead of W. K. Kellogg personally.

To epitomize—the situation on the uncontroverted facts is one in which a doctor licensed to practice medicine in this state did by specific appointment attend a patient and during such attendance received information from such patient in the presence of a third person which, so far as he was concerned, was not necessary to enable him to prescribe for or treat or, in a strict medical sense, act for the patient. The circumstances, however, were such that the patient had a right to believe she was giving to a doctor, who was authorized to attend and talk to her, information necessary to the diagnosis of her illness and for treatment thereof.

The literal limitations of subdivision 4, section 1881, Code of Civil Procedure, as compared with subdivision 2 of the same section, create some apparent difficulties of construction. All such difficulties, as they affect this case, however, have already been resolved by reputable authority. Subdivision 2, *supra,* provides: '' . . . nor can an attorney's secretary, stenographer, or clerk be examined without the consent of his employer, concerning any fact the knowledge of which has been acquired in such capacity.'' Subdivision 4 contains no provision extending the privilege to the nurse, secretary, stenographer or clerk of a doctor.

The historical background of subdivision 4 and the attitude of the courts in construing it are of interest and importance. The right provided for in subdivision 2 finds its source in the common law, whereas the privilege extended by subdivision 4 is purely a creature of statute. In *Howe* v. *Regensburg,* 75 Misc. 132 [132 N. Y. Supp. 837, 838], it is said: ''At common law communications between physician and patient were not legally privileged. . . . The legal privilege seems first to have been recognized in New York in 1828. . . . To the extent, therefore, to which the privilege can now be said to exist, it must find its support in some statutory enactment. Whatever may be urged for or against the

existence of the privilege, we can see no good reason for extending it by implication or construction."

The courts have taken two distinct attitudes with reference to construction. These positions are clearly stated in the case of *Culver* v. *Union Pac. R. Co.*, (1924) 112 Neb. 441 [199 N. W. 794, 796], where the court says: "Some courts have held that the statutes extending such a privilege to physicians or surgeons are remedial in their nature and should be liberally construed, while others take the view that they are in derogation of the common law, and an exception to the general rule; that the maxim *'expressio unius est exclusio alterius,'* should be applied and construed strictly; . . . " (Citing cases.)

Our state has proclaimed its attitude in favor of liberal construction. In the case of *McRae v. Erickson*, 1 Cal. App. 326, at pages 331, 332 [82 Pac. 209], the court says: "But to give to the statute this narrow construction would equally exclude from its application many if not most of the answers to questions usually put, and properly and necessarily put, by competent physicians to patients in cases of this kind, in order to enable them to act for their patients. This, we think, would be to defeat the obvious purpose of the which, it is said, 'is make safe full confidential disclosure by physician of all f circumstances, and symptoms, untled by apprehension of their subsequent and enforced disclosure and publication on the witness stand, to the end that the physician may form a correct opinion, and be enabled safely and efficaciously to treat his patient'. (*Will of Bruendl*, 102 Wis. [45], 47 [78 N. W. 169].) Hence, it is said in the case cited . . . : 'The seal placed on the lips of the physician only relates to "information necessary to enable him to prescribe for such patient as a physician". The tendency of all courts has been and should be toward liberal construction of these words to effectuate the purpose of the statute.' "

Even in New York, which state in the case of *Howe* v. *Regensburg, supra,* apparently announces a doctrine of strict construction, the rule finally adopted is undoubtedly one of liberal construction. Thus in *Klein* v. *Prudential Ins. Co. of America*, 221 N. Y. 449 [117 N. E. 942], it was held that information acquired by a physician from his patient as to some ailment or disease not necessary to the treatment of or

action for the patient in connection with a disease or ailment which the physician was called upon to treat was confidential. In *Springer* v. *Byram*, 137 Ind. 15, 22 [36 N. E. 361, 45 Am. St. Rep. 159, 23 L. R. A. 244], the rule was extended to information acquired from a third person. In the case of *Keast* v. *Santa Ysabel Gold Min. Co.*, 136 Cal. 256, 260 [68 Pac. 771], the privilege given in the statute specifically to the patient is extended to his personal representatives and heirs at law, and in the case of *McRae* v. *Erickson, supra,* the word "necessary" in the statute receives a construction far beyond the literal meaning of the word as used in the statute. Other cases, which will be cited hereinafter, likewise demonstrate that the great weight of authority is in favor of a liberal construction.

Having oriented ourselves as to the attitude of the courts of different states, and particularly by reason of the expressed attitude of our Supreme Court on the subject, we approach a discussion of the questions here involved, assuming that the statute should receive a liberal construction.

[2] The first question of importance which must be decided is, did the relation of physician and patient exist between Dr. Harris and the insured on the facts as outlined? is said in Jones (2d ed.) volume 5, page 4160, "That ent of a physician is not a matter of cold co. or protracted bargaining." The same author says further: "It is the fact of existence of a situation within the general reason and purpose of the statute which determines the existence of the privilege, rather than any contractual relation between physician and person treated." (Jones, *supra*, p. 4163.)

In the case of *Walmer-Roberts* v. *Hennessey*, 191 Iowa, 86 [181 N. W. 798], the prevailing party-plaintiff in the action suffered an injury in a traffic accident. The defendant took the plaintiff to a doctor employed by the defendant. Plaintiff was examined in the presence of defendant, a traffic officer and the doctor's office girl, and the doctor thereafter "advised her as to a course of treatments". (P. 801.) Subsequently, the doctor was called to the stand by the defendant and asked to testify. An objection to his testimony was sustained on the ground that the information the doctor had acquired was privileged. Holding that the relation of physician and patient existed and that the information was

privileged, the court said, quoting from the case of *Battis* v. *Chicago, R. I. & P. Ry. Co.*, 124 Iowa, 623 [100 N. W. 543]: "If, upon request or upon his own motion he (the doctor) assumes to advise or administer treatment to the patient, and the latter in any manner acquiesces therein, the physician thereby casts aside his relation as an employee of the company, and transfers his allegiance to the patient. In such instances a case is presented where one cannot serve two masters at one and the same time. The allegiance of the physician must be wholly upon one side or the other. It matters not, in this connection, who calls him in the first instance, or who pays him. He may present himself at the side of the patient of his own motion and he may not expect or in fact receive pay."

In the case of *Smart* v. *Kansas City*, 208 Mo. 162 [105 S. W. 709, 123 Am. St. Rep. 415, 13 Ann. Cas. 932, 14 L. R. A. (N. S.) 565], the defendant offered to prove the condition of the plaintiff in the action, at the time the injuries were sustained, by one Dr. Fulton. It appeared that Dr. Fulton saw the plaintiff lying on a cot in the city hospital, Dr. Thrush being her physician in attendance at the time; that Dr. Fulton was there holding clinics and looking for subjects to bring into the operating room; that he simply looked at the patient and looked at her right leg; that he did not treat her and that he merely said to Dr. Thrush, "Why don't you take it off?"; that he was not asked to look at the plaintiff, but while she was lying on the cot he merely picked up the cover and looked at her leg.

The Missouri court in holding that the relation of physician and patient existed between Dr. Fulton and the plaintiff said: "We cannot concur with the defendant in its contention that the relation of physician and patient never existed between plaintiff and Dr. Fulton simply because he never treated her, nor ever intended to do so.

"This record shows Dr. Fulton was rightfully in the hospital, was exercising authority over the patients, examining their persons, advising treatment, and removing patients from their wards to the operating room for clinical purposes; and all this with the knowledge and consent of those in charge of the institution. If he was not rightfully there, then he was not only a trespasser in the institution but was guilty of the crime of assault and battery by approaching

plaintiff's bed, where she was lying, and pulling up the covers and exposing her person and making the examination. . . . It is not necessary in order to create the relation of physician and patient that he should actually treat the patient. If he makes an examination of the patient, with her knowledge and consent, she believing that the examination is being made for the purpose of treating her, then the relation is created by implication, and it is wholly immaterial what the secret object or purpose of the physician was in making it; and, in the absence of evidence to the contrary, the plaintiff had the perfect right to assume and rely upon the assumption that the physicians who were apparently in charge of the hospital were rightfully there, and as such, had the authority to examine and prescribe for her, and he will not afterwards be heard to say he was not connected with the institution and had no authority to examine or treat her. If such a thing as that could be done, then the privilege accorded the patient could be taken from her by trick or fraud.''

To the same effect on similar facts see *Beave* v. *St. Louis Transit Co.,* 212 Mo. 331 [111 S. W. 52]; *Mutual Life Ins. Co. of N. Y.* v. *Owen,* 111 Ark. 554 [164 S. W. 720]; *Renihan* v. *Dennin,* 103 N. Y. 573 [9 N. E. 320, 57 Am. Rep. 770].

Our courts have also spoken on what is necessary to create the relationship of physician and patient. Thus, in the case of *Webb* v. *Francis J. Lewald Coal Co.,* 214 Cal. 182, 186 [4 Pac. (2d) 532, 77 A. L. R. 675], the court says: ''First, it is our conclusion that the testimony was privileged under the broad language of subdivision 4 of section 1881 of the Code of Civil Procedure, which reads in part: 'A licensed physician or surgeon cannot, without the consent of his patient, be examined in a civil action, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient. . . . ' The word 'act' as used in this connection seems to cover the very service performed by the witness here. He acted for respondent by making the examination and by making and delivering to her counsel a written report of his findings. He was her physician and she his patient only for this limited purpose.

"But counsel insists that a controlling exception to the above rule is found in the further provision of said subdivision 4 of said section, which reads as follows: 'Provided, further, that where any person brings an action to recover damages for personal injuries, such action shall be deemed to constitute a consent by the person bringing such action that any physician who has prescribed for or treated said person and whose testimony is material in said action shall testify. . . . ' We do not believe that the words 'prescribed for or treated' of this proviso cover the identical scope of the words 'to prescribe or act' found in that portion of subdivision 4 above quoted. . . . A physician may properly act for a patient without having thereby prescribed for or treated him and the case before us seems fairly to be an illustration of this fact."

In the Webb case the court was passing on a situation in which a doctor had been called in to make an examination for the sole purpose of rendering a written report of the physical condition of plaintiff to her attorney. The doctor in question did not attend and had not at any time prior thereto or thereafter attended the patient with the view of prescribing for or treating her in any manner whatsoever.

There can be little doubt that the word "act" has a much broader scope and meaning than the word "treat". Our courts, however, have gone even further in defining the scope of the word "act". Thus, in the case of *McRae* v. *Erickson*, 1 Cal. App. 326, pages 332, 333 [82 Pac. 209], the court says: "We are therefore of the opinion that the view of the court below in this case was correct, and that the intention of the statute is to exclude all statements made by a patient to his physician while attending him in that capacity for the purpose of *determining* his condition. (Italics ours.) Nor does this construction do violence to the language of the act liberally construed; which we think is to be understood as forbidding a physician to be examined 'as to any information acquired in attending the patient, *the acquisition of* which was necessary (or which it was necessary for him to acquire) *in order* to enable him to prescribe or act for the patient'. Of this necessity, from the nature of the case, the physician must commonly be regarded as the sole judge; for it would be obviously unreason-

able to require of the patient the exercise of any judgment with reference to the propriety of the questions asked by his physician, except, possibly, in cases where the materiality of the question is obviously apparent.''

Although the record is silent, so far as direct evidence is concerned with reference to some important details, there are certain inevitable inferences which must be drawn from the evidence which establish without question that the relationship of physician and patient existed as a fact and without the aid of judicial construction.

It is clear from the evidence that the Coffey-Humber Clinic was a cancer clinic. This clinic was established to treat patients suffering from cancer, and it is fair to assume that an applying patient was not injected with the Coffey-Humber extract merely on the statement of the applicant that he had cancer. Someone had to talk to and examine the patients who applied for treatment. That Dr. Harris and other doctors performed these duties is uncontradicted; that Dr. Harris had regular hours at the clinic is uncontradicted; that Dr. Harris had appointments made for him through the girl who kept the registry book and that he met the insured in that way is also uncontradicted. It is further established, without contradiction, that the originals of written reports made by Dr. Harris, showing the results of his examination, were kept by himself, and that copies were transmitted, one to the clinic and one to the W. K. Kellogg Foundation. We can hardly be expected to assume that Drs. Coffey and Humber, who actually administered the treatment by injecting the extract, did not know that Dr. Harris was there, or that they did not know what Dr. Harris was doing. The only reasonable and logical assumption that can be drawn is that Drs. Coffey and Humber knew that Dr. Harris was there, knew exactly what he was doing and that he was performing such functions with their consent. Further, it is fair to assume that a patient could not receive the treatment unless examined by Dr. Harris or some other doctor who performed the same duties as a condition precedent. If these inferences are sound, and we believe as we have stated that they are inevitable, then the examination made by Dr. Harris—both oral and physical —was indispensable to the treatment received and a part thereof. The judicial construction of the statute, the direct

facts proved and the legal inferences which such facts create, convince us that the relationship of physician and patient existed between Dr. Harris and the insured.

 Appellant urges further that not only must the relationship be established, but it must appear that the information claimed to be confidential must have been acquired while attending the patient, and must be such as is necessary to enable him to prescribe or act for the patient. As a Hornbook generality this is so, but this language of the statute has also been construed so as to unfetter the statute from its strict letter and give effect to its intention. Thus, in the case of *McRae* v. *Erickson, supra,* it has been held that even though the information received is not strictly necessary to prescribe and act for the patient, it is held privileged. Many other cases herein cited are to the same effect. We are satisfied on the facts and in view of the law as enunciated in the case of *McRae* v. *Erickson, supra,* that all of the information received, and to which the motion to strike was directed, is within the scope of the statutory privilege.

The sole remaining question of import is whether the presence of the stenographer at the time that the disclosures testified to by the doctor were made by the insured operates as a waiver of the privilege.

 The statute does not provide for a waiver of the privilege, but it has been settled that the privilege may be waived. (*Hirschberg* v. *Southern Pac. Co.,* 180 Cal. 774, 777 [183 Pac. 141]; Jones, (2d ed.) vol. 5, p. 4183.) It must clearly appear, however, that there is an intention to waive, and a court will not run to such a conclusion. Thus, prior to the amendment adding the second and fourth provisos of subdivision 4, section 1881, Code of Civil Procedure, it was held that the representatives of a deceased could not waive the privilege. (*Harrison* v. *Sutter St. Ry. Co.,* 116 Cal. 156, pp. 166, 167 [47 Pac. 1019].) In the Hirschberg case (pp. 776–779), which was a suit for personal injuries, plaintiff called the doctor "who treated her for the first time after the injury . . . described in minute detail the condition of the organs of the pelvic region, including a displacement of the uterus". On cross-examination she was asked if "she was not treated (years before) by a Dr. Marvel for a displacement of her uterus. Her

answer was flatly in the negative; . . . ''. Defendant attempted to introduce the deposition of Dr. Marvel and an objection to its introduction was sustained. In treating the matter, the court said: ''The appellant contends that the deposition of Dr. Marvel was admissible upon two grounds: 'First: Mrs. Hirschberg by her own testimony and by disclosures made with her consent by her physician waived any right which she may have had to the exclusion of the testimony of the physician. Second: She testified that Dr. Emery Marvel was not her physician, and that he had never treated her for any disease except that of lumbago. If he was not her physician, then certainly she could not object to his testifying in the case. In other words, if she claimed the privilege of excluding the communications between Dr. Marvel and herself from the consideration of the jury she could only do so upon the theory that he was her physician. She could not deny that the relationship existed, and in the same breath claim his testimony could not be offered because it was a privileged communication.' . . . The testimony of Dr. Marvel purported to cover information acquired by him while attending the plaintiff as her physician several years before . . . This question, so far as we have been able to find, has never been passed upon in this state. However, the case of *Missouri & N. A. R. Co.* v. *Daniels*, 98 Ark. 352 [136 S. W. 651], decided in 1911 by the supreme court of Arkansas, is so clearly analogous in its facts and presents so concisely the exact point of law here involved that we will quote from it at some length. . . .

'' 'Counsel for the defendant upon cross-examination of plaintiff asked her if the physicians whom defendant desired to introduce as witnesses as to her condition prior to the alleged injury had not treated her in 1907 for displacement of the womb. This she denied, and it is now urged by the defendant that it was entitled to have the benefit of these physicians' testimony in order to contradict the plaintiff. But, if the defendant's position in this respect should be upheld, then the above statute in regard to privileged communications would be easily evaded. In any cause where the opposing party desired to obtain the testimony of an attending physician, it could be secured in like manner, although against the objection of the patient. The plain

provisions of the statute forbidding such testimony by a physician cannot thus be abrogated. . . . ' "

The foregoing authorities make clear that a waiver will not be implied by the courts unless the facts decisively show or a clear preponderance of the inferences from the facts impels a finding that the privilege has been waived. We will now proceed to the problem here presented.

 As already suggested, the mere presence of a third person does not mean that the privilege has been waived as to the doctor. The capacity in which the third person is present makes a real difference. There are three lines of cases in this respect. One in which a third party is present, whose presence is in no respect necessary, and this is obviously apparent to the patient. In this type of case some decisions hold that both the physician and the third party may testify (*Horowitz* v. *Sacks*, 89 Cal. App. 336 [265 Pac. 281]), and some that the third party only may testify. (*Indiana Union Traction Co.* v. *Thomas,* 44 Ind. App. 468 [88 N. E. 356]; *Walmer-Roberts* v. *Hennessey,* 191 Iowa, 86 [181 N. W. 798].) The second line of authorities applies to that type of case in which a third party is present and the patient has a right to believe that said party is present as one of the agents or assistants of the physician in charge. In this class the authorities agree that the attending physician cannot testify, but as to the third persons they divide themselves into three groups. The first group for convenience may be referred to as the coprofessional class, in which it is held that when said third party being a licensed doctor is a consulting doctor (*Renihan* v. *Dennin, supra; Leonczak* v. *Minneapolis etc. Ry. Co.,* 161 Minn. 304 [201 N. W. 551]); or an assistant doctor (*Renihan* v. *Dennin, supra; Prader* v. *National Masonic Acc. Assn.,* 95 Iowa, 149 [63 N. W. 601]; *Edington* v. *Mutual Life Ins. Co.,* 67 N. Y. 185, 194); or the partner of a doctor (*Raymond* v. *Burlington C. R. & N. Ry. Co.,* 65 Iowa, 152 [21 N. W. 495]; *Aetna Life Ins. Co.* v. *Denning,* 123 Ind. 384 [25 N. E. 86]), neither the attending doctor nor his coprofessional may testify.

The second group for convenience may be called professional agents, in which it is held that when a nurse or other third person is actually working as agent and assistant under the supervision of the doctor in charge, such agent is

covered by the privilege as well as the doctor. A study of the cases in this group, however, shows that the statute had been extended to include nurses. (*Culver* v. *Union Pac. R. Co.*, 112 Neb. 441 [199 N. W. 794].) Such not being the fact here, we will not discuss this group, although the Culver case, *supra,* speaking without regard to the amendment of the statute to include nurses, does suggest that the statute should as a matter of law be extended to the professional assistant. We express no opinion on the suggestion, since none is necessary to a decision of this case.

The third group holds that in situations where the presence of a third person is apparently necessary, the doctor is covered by the privilege, but the necessary third person is not. (*Hobbs* v. *Hullman*, 183 App. Div. 743 [171 N. Y. Supp. 390]; Id., 188 App. Div. 983 [177 N. Y. Supp. 917]; *Southwest Metals Co.* v. *Gomez*, (Ariz.) 4 Fed. (2d) 215 [39 A. L. R. 416]; *Springer* v. *Byram*, 137 Ind. 15 [36 N. E. 361, 45 Am. St. Rep. 159, 23 L. R. A. 244]; *North American Union* v. *Oleske*, 64 Ind. App. 435 [116 N. E. 68, 70]; *Denaro* v. *Prudential Ins. Co.*, 154 App. Div. 840 [139 N. Y. Supp. 758]; *People* v. *Brower*, 53 Hun, 217 [6 N. Y. Supp. 730]; *Cahen* v. *Continental etc. Co.*, 41 N. Y. Super. Ct. 296; *Walmer-Roberts* v. *Hennessey, supra.*)

The third general line of authority applies to those cases in which a nurse or other third party, as separate individuals in independent positions and not as incidents to a conference with the doctor in charge, receive medical confidence. All of these cases are to the effect that such confidence is not within the privilege. (*Mississippi P. & L.* v. *Jordan*, 164 Miss. 174 [143 So. 483]; *Culver* v. *Union Pac. R. Co.*, 112 Neb. 441 [199 N. W. 794]; *Wills* v. *National Life & Accident Ins. Co.*, 28 Ohio App. 497 [162 N. E. 822].)

An analysis of the facts in the foregoing cases and the rules therein enunciated demonstrates the extreme jealousy on the part of practically every court, which has been asked to construe a statute similar to our own, to guard the privilege and to save it from being frittered and nibbled away because of factual situations which do not come within the letter of the statute, but are plainly embraced within its intent and spirit.

Aside from the fact that the great weight of authority demonstrates that in a situation, such as here presented, a

doctor cannot testify, which fact of itself points the road for this court to follow in the absence of authority of our own, New York authority on this subject is particularly persuasive upon this court. The statute construed in the cited New York cases, before the amendment to include nurses, was identical to our own. Our Supreme Court has said: " . . . since our statute seems to be framed closely after that of New York, the construction given the latter by the courts of that state should have great weight with us in interpreting the meaning of our own." (*Harrison* v. *Sutter St. Ry. Co., supra*, p. 168.)

The only California case to which our attention has been called which is at all related on the facts is the case of *Horowitz* v. *Sacks*, 89 Cal. App. 336 [265 Pac. 281]. In that case, the court says at page 344: " . . . All of the information the witness obtained from his patient was obtained in the presence and hearing of third parties, the husband, mother, and brother of the patient. Such communications of the patient were not confidential and therefore were not privileged." It will be discerned, however, that the Sacks case is easily distinguished in at least one vital element, even if there were no other elements in that case which do distinguish it. In the instant case the communications were made in the presence of a necessary third party who was acting as the agent of the doctor, under his direction and supervision and under such circumstances that the patient had every right to conclude that the presence of such third party was necessary. In the Sacks case the information was given in the presence of nonprofessional and unnecessary third persons, in so far as the attendance of the doctor was concerned. It is apparent that although called a stenographer, the third party in the instant case was in reality and did perform all the duties of an office nurse. This distinction calls for the application of a principle different from that applicable when a third party has, strictly speaking, no business being present. (See cases *supra*.) The statement in the Sacks case must, however, be construed in relation to the facts to which it was applied. As a general statement purporting to be the law in all cases, it cannot be accepted, and the cases cited to support the general statement made in the Sacks case do not so hold. It is quite clear that the court in the Sacks case did not

so intend it, when the statement is read in the light of the authorities cited to support it, and the facts to which it was applied. The cases referred to in the Sacks case and others called to our attention by appellant with practical unanimity are decided on the doctrine that the communications made and testified to were not in fact confidential, and were not intended to be so by the person making them, and this conclusion is reached by the court in those cases not merely because the nonprofessional unnecessary third party was present, but on additional facts such as the voluntary nature of the statements, their irrelevancy to the confidential relationship, the fact as to whether the relationship existed at all, and other important circumstances.

In *Southwest Metals Co.* v. *Gomez, supra,* the federal Circuit Court of Appeals· of this district had before it a parallel situation—the construction of an Arizona statute similar to our own. It was there held that the nurse could testify, but that the doctor could not. We are satisfied that the presence of the stenographer did not operate to waive the privilege, in so far as the doctor was concerned, and that the motion to strike was correctly granted. Since the stenographer was not called and did not testify, we are not called upon to determine whether she could testify.

There being no other errors called to our attention and none other appearing, the judgment is hereby affirmed.

Conrey, P. J., and York, J., concurred.