JENKINS, APPELLANT, *v.* METROPOLITAN LIFE INSURANCE CO., APPELLEE.*

(No. 8747—Decided May 9, 1960.)

*Messrs. Rendigs, Fry & Kiely,* for appellant.
*Messrs. Marble & Vordenberg,* for appellee.

O'CONNELL, J. The facts in this case disclose that on or about September 4, 1952, William A. Jenkins made an application for life insurance to the Metropolitan Life Insurance Company; that on September 20, 1952, Jenkins appeared before a medical examiner of the insurance company and answered questions in part B of the policy, which answers Jenkins maintained were true; that thereafter a policy, dated September 6, 1952, but which was not accepted until November 4, 1952, was issued;

*Judgment affirmed, 171 Ohio St., 557.

that on June 24, 1954, the insured died from a coronary occlusion and a claim for payment was made by the plaintiff; that at that time the plaintiff executed an instrument, addressed "to any physician or to the superintendent of ........ and to the superintendent of any other institution where the deceased person named below has been treated within three years," which instrument authorized the bearer "to make or obtain a copy in whole or in part or an abstract of any records you may have concerning the above named decedent [William A. Jenkins]," and "to submit such copy or abstract directly to the Metropolitan Life Insurance Company as part of the proofs of the said claim [claim of plaintiff Helena I. Jenkins for proceeds of policy]." The plaintiff's acknowledgement of her execution of this instrument was taken before a notary public.

The facts further reveal that defendant refused to pay the claim, contending that Jenkins had made false answers in his application; that defendant had tendered to plaintiff the premiums that had been paid on the policy; and that the tenders had been refused.

In the trial of the case, plaintiff testified that she was the spouse of Jenkins; that he had died on June 24, 1954, and that proof of claim had been filed. Having introduced the policy and the proof of death in evidence, plaintiff rested.

The defendant maintained its case largely through depositions. First, it offered the testimony of Robert M. Laird, Jr., an auditor of the insurance company, who identified the application for insurance. It then read the testimony of Dr. Klopper who had treated Jenkins on June 28, 1948, July 6, 1948, July 10, 1948, and March 11, 1949. Jenkins' complaints were "head cold, nervousness, morning cough, and posterior nasal drip." In answer to the question, "What, if any, advice or instructions did you give him in that regard [daily consumption of three or four glasses of beer]?" the witness answered, "I felt that was more than necessary and felt that he should reduce his alcohol, tobacco, and coffee consumption also."

Then followed the reading of the deposition of Dr. Wm. J. Krech. He testified that he had seen Jenkins on February 18, February 23, March 3, and March 8 in 1952. He was asked, "Your diagnosis. What was your diagnosis?" His answer

was, "Diagnosis was eustacian tube catarrh and a questionable sinusitis in the right maxillary antrum."

This deposition was followed by that of Dr. George F. Millay. Dr. Millay testified that he had first seen Jenkins on January 21, 1952, and that other visits were made in 1952, on January 28, January 29, August 11, August 19, September 8 and October 7. In answer to the complaint that Jenkins had on August 11, Dr. Millay said, "The complaint at that time was of swollen ankles." Later, Dr. Millay was asked: "What did you discover from your examination [on August 11]?" His answer was, "I found that his feet and ankles were swollen and that his blood pressure was 190 over 100, which is elevated above normal." After describing subsequent visits and treatment for blood pressure which was above normal, Dr. Millay was asked whether the condition (swollen ankles and feet) was associated with or disassociated from the heart condition. He answered, "I believe that it was associated with his hypertension and subsequent mild right heart failure." Dr. Millay further testified that he "told him [Jenkins] on those visits in August and also September and October of '52—I made him aware of the fact that his blood pressure was elevated and to what degree."

Then was read the deposition of Dr. James H. Hardie, who testified concerning Jenkins' application for insurance. According to Dr. Hardie, the questions had been read to Jenkins and his answers had been noted. After Jenkins had read the questions and answers, he signed the application. Then Dr. Hardie stated that if he had known of Jenkins' treatment for high blood pressure and edema, he would have given additional examinations to Jenkins.

The defendant then called as a witness Adam J. Becker, a life underwriter for the insurance company. He testified that he had seen the Jenkins' application. He was asked, "Now, if instead of the answer 'No' to that question [whether the applicant ever had been treated for or sought advice concerning any ailment or disease of the heart or lungs, to which there had been a negative answer] he [Jenkins] had revealed that he had consulted, had been examined, and received treatment from Dr. Millay on August 11, 1952, August 19, 1952, and September 8, for 2-plus edema and hypertension, with a blood pressure of

190 over 100, and a diagnosis of mild right-sided heart failure, due to hypertensive cardiovascular disease, what would you have done?'' his answer was, ''I would have referred the application to our medical division for further instruction.''

There was this further question and answer: ''Q. You would not have approved it under those circumstances? A. I would not have approved the application.''

The witness further testified that he would not have approved the application and that he would have referred it to the medical department for further consideration, if he had known: That the applicant had been treated for high blood pressure; that he had been advised to modify his drinking and living habits; that he had ''consulted any physician * * * within the last five years for any reason not mentioned above''; ''if he had also stated that in February and March, 1952, he had consulted and been treated by a Dr. Krech, on February 18, 23, March 3 and March 8 of that year, without further information as to the nature of the treatments or the diagnosis of his case''; ''if additionally he had informed you that on August 11, August 19, and September 8, 1952 he had consulted and been treated by Dr. Millay, without further information''; and ''if in addition to any treatment received from Doctor Millay in November 1951 for a cold he had stated that on August 11, 1952, August 19, 1952, and September 8 he had been under the care of Dr. Millay who diagnosed his case as hypertensive heart disease with mild right-sided heart failure.''

The next witness, Dr. David M. Benford, assistant medical director of the insurance company, testified that, had Jenkins' answers revealed the facts testified to by the various doctors called by the defendant, he would not have approved the application.

The witness August Bondi, district manager for the insurance company, testified that he had offered to Helena I. Jenkins the premiums that had been paid on the policy.

The defendant, having rested its case, made a motion for a directed verdict, which the court granted. The case is in this court on an appeal from the granting of this motion.

It is the contention of the plaintiff that ''the court has erred in admitting testimony of physicians attending William

A. Jenkins prior to his death" and that "the court has erred in directing a verdict for the defendant, Metropolitan Life Insurance Company."

To these assignments of error, the defendant maintains that the patient-physician privilege has been waived and lost and that the direction of the verdict has been proper.

If the plaintiff has waived or lost the patient-physician privilege, this case must be decided in the defendant's favor, but if this privilege has not been waived or lost by the plaintiff, then judgment should be for this plaintiff. This is the question then to be decided by this court.

Now the statute, Section 2317.02, Revised Code, concerning privileged communications, subdivision (A), is as follows:

"An attorney, concerning a communication made to him by his client in that relation or his advice to his client; or a physician, concerning a communication made to him by his patient in that relation, or his advice to his patient, but the attorney or physician may testify by express consent of the client or patient, or if the client or patient be deceased, by the express consent of the surviving spouse or the executor or administrator of the estate of such deceased client or patient; and if the client or patient voluntarily testifies, the attorney, or physician may be compelled to testify on the same subject."

In this regard, 8 Wigmore on Evidence, 830, Section 2388, says "that the waiver must be in express language is not necessary upon any principle. Yet this is sometimes required by statute." (As it is in Ohio.)

Also, in 33 Connecticut Bar Journal, 180, the author says that, "since the protection is for the benefit of the client, he may waive it expressly or impliedly."

And this statute is in derogation of the common law, for under that procedure "a physician, when called upon to testify as a witness, had no right to decline or refuse to disclose any information on the ground that such information had been communicated to him confidentially in the course of his attendance upon, or treatment of, his patient in a professional capacity." (42 Ohio Jurisprudence, 259, Section 257.)

However, the duty to refrain from disclosing the particulars of the disease and treatment has been incumbent on the

medical profession throughout the centuries. Thus, Clinton DeWitt, in 10 Western Reserve Law Review, 488 (Privileged Communications between Physician and Patient), states that "Hippocrates (circa 400 B. C.), renowned as the 'Father of Medicine,' was perhaps the first to express the ethical duty of the physician. His oath, a self-imposed criterion of professional conduct, has come down through the ages. Pledging himself that never would he voluntarily divulge the medical confidences of his patients, Hippocrates vowed, among other things:

"'Whatsoever things I see or hear concerning the life of men, in my attendance on the sick or even apart therefrom which ought not to be noised abroad, I will keep silence thereon, counting such things to be as sacred secrets.'"

Thus many (two-thirds) of the states in this country eventually followed New York (1828) in adopting the patient-physician privilege.

And so, "in Ohio, a physician is forbidden by the statute to testify concerning a communication made to him by his patient, or concerning his advice to the patient. * * * The authorities are contradictory as to whether statutes of this nature should be liberally or strictly construed." (42 Ohio Jurisprudence, 260, Section 257.) However, it was held in paragraph four of the syllabus of *Weis* v. *Weis*, 147 Ohio St., 416, that "Section 11494, General Code [Section 2317.02, Revised Code], making privileged communications between certain persons, being in derogation of the common law, must be strictly construed." However, in *Kramer* v. *Policy Holders Life Ins. Assn.*, 5 Cal. App. (2d), 380, 42 P. (2d), 665, it is said, in paragraph two of the Pacific Reporter headnotes, that "Statute, making communications between physician and patient privileged, should be liberally construed (Code Civ. Proc., Section 1881, subd. 4)."

Now, "in Ohio it is held that there can be a waiver of the privilege only in one of two ways provided by the statute. As one of the ways in which a waiver may be made, the statute provides that the physician may testify if his patient has expressly consented thereto. The patient may waive the privilege by examining his physician on the matter covered by the privilege, although there is, of course, no waiver where the questions asked the physician are preliminary and for a collateral

purpose. The privilege may also be waived by taking the deposition of the physician * * *." (42 Ohio Jurisprudence, 270, Section 269.)

Thus, it is said in *Ausdenmoore et al., Exrs.*, v. *Holzback*, 89 Ohio St., 381, at page 383, that "there cannot be a waiver except in two ways: First, by an express consent of the patient, or by the patient taking the stand and voluntarily testifying as to the things and matters communicated to his physician, the latter being held to be in effect an express waiver as to that physician. There being no express waiver nor any testimony by the plaintiff, touching the things and matters communicated to such physician, whose testimony was excluded, we find no error."

And, according to DeWitt, Privileged Communications Between Physician and Patient (1958), at page 348: "As interpreted by the courts, the phrase 'expressly waived' does not mean that the waiver must be formally made, either orally or in writing, but the intent to waive must be expressed either by word or act or omission to speak or act. In other words, an express waiver of the privilege may be implied from the conduct of the patient, or his personal representative, or from proceedings which he has taken or allowed others to take."

And the same text and author have this to say, on pages 411 and 412: "Manifestly, if the patient himself breaks the seal of secrecy and voluntarily gives publicity to the whole matter, he plainly abandons the protection of the statute which would otherwise be available to him: and this is true whether the publicity is given by the testimony of the plaintiff himself, or by the testimony of his physician, or by the testimony of his other witnesses. The adverse party, therefore, may call as a witness any physician who has attended the patient and he may testify concerning the injury, ailment, or disability of which the patient complains. It is both logical and just that when the patient voluntarily makes public the details of his affliction, or gives his version of what the physician said or did, he should not be permitted to insist that the protection and benefits of the statute continue to exist as to his physician. When he chooses to make public that which could have been kept secret, the privilege no longer exists and the physician may testify on the same subject."

In 58 American Jurisprudence, 251, Section 443, there is a dissertation on what constitutes a waiver of the privilege as to communications between physician and patient. Here we learn that "subject to the provisions of the controlling statute, the waiver of the statutory privilege as to communications between physician and patient may be either express, as by contract of the patient, or it may be implied from the acts of the patient or of his legal representative, if the latter is authorized to waive the privilege."

However, under the Ohio statute there is no implied waiver except that effected through the *voluntary* testifying of the patient himself. And, as it was held in paragraph three of the syllabus of *Harpman* v. *Devine, Recr.*, 133 Ohio St., 1: "Merely answering questions as to treatment from physician in response to questions on cross-examination does not waive the privilege under Section 11494, General Code. Such testimony is not voluntary within the purview of the statute."

Therefore, the insured may waive the privilege in accordance with the statute. However, in paragraph two of the headnotes of *Vilardi* v. *Vilardi*, 107 N. Y. Supp. (2d), 342, it was held that "a patient may waive privilege of physician and patient"; the "waiver must be either in open court or on trial of action or on written stipulation." This decision is in accordance with an amendment to the statute (1891). And, "upon the question whether the personal representatives, heirs, or beneficiaries of the patient can waive his privilege, the courts are divided." (42 Ohio Jurisprudence, 270, Section 268.) So, in *Parisky, Admr.*, v. *Pierstorff*, 63 Ohio App., 503, the syllabus holds that "the right of the patient to waive the protection given him under Section 11494, General Code, relating to privileged communications between physician and patient, does not survive to his administrator and it is incompetent for the administrator to offer the testimony of the physician of his decedent, as to communications made to him in his capacity as a physician, in a wrongful death action." Of course, this decision was prior to the 1953 amendment to the statute, which amendment added to the law these words, "or if the client or patient be deceased, by the express consent of the surviving spouse or the executor or administrator of the estate of such deceased client or patient."

It remains for us to determine whether the authority given by the surviving spouse in an instrument, signed by her, to the Superintendent of Institutions in general and to physicians to permit the bearer "to make or obtain a copy * * * of any records * * * concerning the above named decedent [Jenkins]" and the further authorization to bearer to present such copy to the Metropolitan Life Insurance Company, constituted an express waiver of the privilege by the said surviving spouse.

In 97 Corpus Juris Secundum, 856, Section 310, the following language is used as to what constitutes a waiver: "A waiver of privilege as to confidential communications need not be expressed in writing or in any particular form, where not so required by statute, but the waiver must be distinct and unequivocal and the intent to waive must be expressed either by word or act or omission to speak and act. Generally, the privilege is waived whenever the person entitled to the protection of the statute voluntarily makes public matters of which a disclosure without his consent is forbidden."

Similar language is used in *Magida* v. *Continental Can Co., Inc.* (D. C. N. Y.), 12 F. R. D., 74, paragraph four of the headnotes of that case reading as follows: "Where there has been a clearly expressed waiver of privilege of confidential communications between attorney and client, the deponent cannot object to questions concerning the privileged matter, and the waiver need not be expressed nor in any particular form, but the intent to waive must be expressed either by word or act or omission to speak and act. Civil Practice Act, N. Y., Section 353."

And attention is called to the following case directly bearing on the present case: In *In re Loewenthal* (Ohio App. 1956), 134 N. E. (2d), 158, the first paragraph of the headnotes says that: "Waiver of privilege against physician's testimony as to patient's physical condition and physician's treatment thereof is implied from patient's conduct indicating plain intention to abandon privilege or placing plaintiff in such position with reference to evidence that it would be unfair and inconsistent to permit retention of privilege. R. C. Section 2317.02."

Now, it is the opinion of this court that the personal representative of the deceased has expressly waived the privilege in accordance with the rules and regulations as they are laid down

by the courts, the text and the periodical writers. Certainly, by signing the authorization addressed to "any physician" to communicate to "bearer" any of his records pertaining to the illness of the deceased and at the same time authorizing the bearer to turn over to the insurance company these records, she was giving the insurance company the opportunity to cross-examine privately these doctors concerning the illness of the deceased. In itself, this is an express waiver of the privilege.

At the same time she was waiving the privilege by indicating her "plain intention to abandon [the] privilege" and placing herself "in such position * * * that it would be unfair * * * to permit retention of the privilege." In her case, the waiver was not in "any particular form," but her "intent to waive" was expressed by words and acts. It was, furthermore, "distinct and unequivocal," and it voluntarily made "public matter of which a disclosure without [her] consent" would have been forbidden. Therefore, the "adverse party" was justified in calling as witnesses physicians who had attended the patient, and these physicians could "testify concerning * * * the ailment or disability of which the patient" was complaining. In the case of this plaintiff, therefore, "an express waiver" could "be implied from the conduct" of the representative.

From the evidence submitted by the defendant's witnesses, it is clear that some of the answers given by the applicant were false, and that had the true and proper answers been given the application for insurance would either have been refused, or referred to the insurance company's medical department for further study. Because, therefore, the insurance contract was brought about by fraud, and because the plaintiff's claim is based on the contract, judgment must be for the defendant.

The judgment of the Court of Common Pleas of Hamilton County is, therefore, affirmed.

*Judgment affirmed.*

MATTHEWS, P. J., and LONG, J., concur.