[No. A131496. First Dist., Div. Five. Feb. 15, 2012.]

JILL DURONSLET, Plaintiff and Respondent, v.
JOYCE KAMPS, Defendant and Appellant.

### COUNSEL

Zacks & Utrecht, Paul F. Utrecht and James B. Kraus for Defendant and Appellant.

Tour-Sarkissian Law Offices, Christine Tour-Sarkissian and Heather Wolnick for Plaintiff and Respondent.

### OPINION

**JONES, P. J.**—The trial court issued an injunction pursuant to Code of Civil Procedure section 527.6 protecting Jill Duronslet and her immediate family from Joyce Kamps. On appeal, Kamps contends the injunction must be reversed because the only evidence that she made a "credible threat of violence" under section 527.6, former subdivision (a)[1] was inadmissible multiple hearsay protected by the physician-patient privilege.

We affirm. We conclude Kamps forfeited her objections to certain hearsay evidence offered at the hearing on Duronslet's injunction. We also conclude the trial court may consider such hearsay evidence when deciding whether to issue an injunction pursuant to Code of Civil Procedure former section 527.6. Finally, we conclude Kamps has failed to satisfy her burden to demonstrate that statements she made to a nurse at Pacific Family Medical Center were covered by the physician-patient privilege set forth in Evidence Code section 990 et seq.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2010, Duronslet and Kamps co-owned a two-unit building in San Francisco; Kamps lived upstairs and Duronslet lived downstairs with her husband and two children. In approximately 2004, Kamps and Duronslet began converting their building from a tenancy-in-common to condominiums. Kamps and Duronslet disagreed about whether to convert the building, prompting Duronslet to file a petition to compel arbitration. Kamps and Duronslet eventually arbitrated their dispute.

In 2006, Kamps and Duronslet had a "break-down in communication" and their relationship deteriorated. In December 2008, Kamps pushed Duronslet's

---

[1] Recently, Code of Civil Procedure former section 527.6 was amended and relettered. Some subdivisions of the statute were relocated. We refer to section 527.6 as it existed at the time the court issued the injunction.

[2] Unless otherwise noted, all further statutory references are to the Evidence Code. We refer to the woman to whom Kamps made the statements as a nurse because it is not clear from the record whether she was a registered nurse or a nurse practitioner.

husband during a city inspection, causing Duronslet and her husband to become concerned about Kamps's hostility toward them. In October 2009, Kamps screamed and yelled at Duronslet for parking her car in the common garage; Kamps threatened to call the police and have Duronslet's car towed. Duronslet's children, who witnessed the incident, were visibly upset. Duronslet believed Kamps "cut the cords that connected the backyard sprinklers to the water meter" because Kamps disagreed with Duronslet about how the water bill should be apportioned. In early December 2009, Kamps saw Duronslet with her husband and children and "gave [them] the finger . . . unprovoked."

On December 20, 2010, San Francisco Police Officer Jimmy Lee came to the Duronslet and Kamps's building looking for Kamps. He did not tell Duronslet why he was looking for Kamps because Duronslet's children were present. Later, during a telephone call, Lee told Duronslet that Kamps had made threats about Duronslet to a nurse, who reported the threats to the police. Terrified for her family's safety, Duronslet and her husband stayed at a hotel for several days. On December 23, 2010, the San Francisco Police Department applied for and obtained an emergency protective order prohibiting Kamps from contacting Duronslet, her husband, and her children. Duronslet and her husband received a copy of the emergency protective order.

*Duronslet's Request for an Injunction Pursuant to Code of Civil Procedure Former Section 527.6*

That same day, Duronslet requested an injunction prohibiting Kamps from harassing her and her immediate family under Code of Civil Procedure former section 527.6. In her request (form CH-100), Duronslet alleged Kamps told a nurse at Pacific Family Practice Medical Group that she planned to kill her neighbor and then kill herself. After hearing about the threat from Lee, Duronslet temporarily moved her family out of her residence because she and her husband were concerned about what "Kamps may do to us or our children. [Kamps] has repeated[ly] expressed hatred and anger toward us."

In a declaration in support of her injunction request, Duronslet averred "Kamps told the nurse that she had a will and funeral arrangements made and that she planned to kill her neighbor and then herself." Duronslet stated that Lee called her on December 22, 2010, and told her, "based on the advice of the psychiatric liaison[,] he would be issuing an emergency protective order that would last a few days."[3] Duronslet also received a call from Elsie Dunn, the psychiatric liaison, about Kamps. In her declaration, Duronslet described

---

[3] Duronslet's declaration attached Lee's application for the emergency protective order and the emergency protective order. In his application, Lee stated Debbie Tassone—presumably an employee of Pacific Family Practice Medical Group—said that "during a doctor's visit, Kamps

Kamps's behavior as "inconsistent and distressing" and averred she was terrified for her safety and her family's safety. Duronslet stated she believed Kamps intended to harm Duronslet and her family.

Duronslet's attorney submitted a declaration in support of the injunction request attaching a redacted police report faxed to her by an officer from the San Francisco Police Department. According to the redacted police report, Lee went to the Pacific Family Practice Medical Group on December 20, 2010, after receiving a *"[T]arasoff* report."[4] The office manager told Lee that Kamps was seen by a nurse for about 30 minutes on the afternoon of December 15, 2010, and "made threats to kill her neighbor and commit suicide." The nurse was not in the office when Lee responded to the *Tarasoff* report. The office manager told Lee she discovered the information while reviewing medical records on December 20, 2010, and called the police. The office manager explained that Duronslet's husband, who is also a patient of the medical group, "happened to be in the waiting room when Kamps was in the nurse's office. When Kamps exited the [treatment] room" she saw Duronslet's husband and said, " 'That's him. . . . That's him.' " In the police report, Lee described his communication with the Duronslet family, noting that Duronslet told him that "Kamps had never threatened or acted violently toward[] her or her husband . . . in the past" but that there had "been some friction between them due to an on-going effort to convert their building . . . to a condo."

In her answer, Kamps denied the allegations in Duronslet's injunction request and claimed Duronslet did not suffer emotional distress. She also noted she and Duronslet "are co-owners of property who must communicate in order to resolve issues concerning their property."

*The Hearing and the Court's Order Issuing an Injunction*

At the hearing, Kamps's attorney objected to the police report "based on hearsay and doctor/patient privilege." The court overruled the physician-patient objection, noting, "there is no doctor/patient privilege if there's a threat of violence . . . the medical office reported it to the police because it was a threat of violence. So once there is a threat of violence, there is no doctor/patient privilege." The court "noted" the hearsay objection. Kamps did not object to Duronslet's declaration or to the attached documents.

---

told a nurse that she suffers from depression due to her neighbor. Kamps told [the] nurse that she was going to kill her neighbor and commit suicide."

[4] *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334].

Duronslet testified that when Lee came to her house and told her "about the threat," she took it "very seriously" and decided to stay in a hotel with her family because she was not "sure what [Kamps] would do and if she truly would harm" Duronslet and her family. She explained that when she told Lee that Kamps had never threatened her or acted violently, she was in a state of shock; later, when she had time to reflect, she recalled several incidents where Kamps had threatened her or acted violently. Neither Kamps nor the nurse testified at the hearing.

At the conclusion of the hearing, the court issued a three-year injunction pursuant to Code of Civil Procedure former section 527.6 prohibiting Kamps from contacting Duronslet, her husband, and her two children except through third parties (form CH-140). The injunction also required Kamps to stay away from the Duronslets.

## DISCUSSION

■ The Legislature enacted Code of Civil Procedure former section 527.6 " 'to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution.' [Citations.] It does so by providing expedited injunctive relief to victims of harassment. [Citation.]" (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1412 [23 Cal.Rptr.3d 609]; see *Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 648 [24 Cal.Rptr.3d 619].) Code of Civil Procedure former section 527.6 enables "[a] person who has suffered harassment"—defined as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose"—to "seek a temporary restraining order and an injunction prohibiting harassment as provided in this section." (Code Civ. Proc., § 527.6, former subds. (a), (b).)

■ "Upon filing a petition for an injunction under this section, the plaintiff may obtain a temporary restraining order . . . . A temporary restraining order may be issued with or without notice upon an affidavit that, to the satisfaction of the court, shows reasonable proof of harassment of the plaintiff by the defendant, and that great or irreparable harm would result to the plaintiff. . . ." (Code Civ. Proc., § 527.6, former subd. (c).) Within 22 days from the date the temporary restraining order is issued, the court must hold a hearing "on the petition for the injunction. The defendant may file a response that explains, excuses, justifies, or denies the alleged harassment or may file a cross-complaint under this section. At the hearing, the judge shall receive any testimony that is relevant, and may make an independent inquiry. If the judge finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment. An injunction issued pursuant to this section shall have a duration of not more than three years. At any

time within the three months before the expiration of the injunction, the plaintiff may apply for a renewal of the injunction by filing a new petition for an injunction under this section." (Code Civ. Proc., § 527.6, former subd. (d).)

As used in Code of Civil Procedure former section 527.6, a " '[c]redible threat of violence' " is a "knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (Code Civ. Proc., § 527.6, former subd. (b)(2).) The statute requires "clear and convincing evidence that unlawful harassment exists." (Code Civ. Proc., § 527.6, former subd. (d).) We review the order granting the injunction under section 527.6 for substantial evidence. (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 [283 Cal.Rptr. 533] (*Schild*).)

I.

*Kamps Forfeited Her Hearsay Objections by Failing to*
*Object to Duronslet's Declaration or the Documents*
*Attached to It*

Kamps's first contention is the injunction must be reversed because it "relies solely on hearsay." Specifically, Kamps claims the court erred by admitting the following multiple hearsay: (1) Lee's emergency protective order application, which contained Kamp's statement telling "a nurse that she suffers from depression due to her neighbor" and that "she was going to kill her neighbor [and] commit suicide"; (2) a portion of Duronslet's declaration where Duronslet averred "Kamps had made threats about me to a nurse, who had then made a report to the police . . . Kamps told the nurse that she had a will and funeral arrangements made and that she planned to kill her neighbor and then herself"; and (3) information from the police report describing Lee's conversation with the office manager at Pacific Family Practice Medical Group who made the *Tarasoff* report and who described Kamps's murder-suicide threat to Lee.

Kamps has forfeited her hearsay objection to the emergency protective order application and her objection to the statements in Duronslet's declaration because she did not object to either document in the trial court. At the outset of the hearing on Duronslet's request for an injunction, Kamps objected to the police report "based on hearsay and doctor/patient privilege." The court overruled the privilege objection, explaining the physician-patient privilege did not apply when "there's a threat of violence." Duronslet then testified that "when the police came to our house and when they told me about the threat, I took it very seriously. It caused a lot of fear for me and for

my family. And we decided to leave and stay in a hotel over Christmas because we weren't sure what she would do and if she truly would harm us." Counsel for Kamps then objected "based on hearsay" because Duronslet was "relating a statement that was made by an office manager who didn't speak with [Kamps] . . . ." The court "noted" the objection and allowed Duronslet to continue testifying. At the conclusion of the hearing, Kamps argued Duronslet had not proven a "serious threat of violence. . . . The only evidence they put in is a police report that states that the office manager of a doctor's facility . . . ." The court interrupted and asked counsel why it should not admit the police report; counsel responded, "because it's inadmissible based on two ground[s]. First, it's hearsay. And on the second ground, it's a violation of the doctor/patient privilege. [*Tarasoff*] does not apply here . . . ."

At no point before or during the hearing did Kamps object to the emergency protective order application, or to Duronslet's declaration. Because she did not object, she has forfeited her claim that the court erred by admitting this evidence. To obtain reversal based on the erroneous admission of evidence, the record must show a timely objection making clear that specific ground. (§ 353; *In re C.B.* (2010) 190 Cal.App.4th 102, 132 [117 Cal.Rptr.3d 846] [hearsay objections "waived by the failure to object below"].) Lack of such objection deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission. (See *People v. Waidla* (2000) 22 Cal.4th 690, 717 [94 Cal.Rptr.2d 396, 996 P.2d 46].)[5]

In her reply brief, Kamps claims she was not required to object to the emergency protective order application or to Duronslet's declaration because doing so would have been futile. According to Kamps, "the trial judge here was letting the police report in. She obviously would have let the same hearsay in whether it was repeated in the protective order or relayed . . . by Duronslet." Kamps relies on *People v. Antick* (1975) 15 Cal.3d 79, 95 [123 Cal.Rptr. 475, 539 P.2d 43] (*Antick*), and *People v. Hill* (1998) 17 Cal.4th 800, 821 [72 Cal.Rptr.2d 656, 952 P.2d 673] (*Hill*). Both cases are distinguishable.

---

[5] Having reached this result, we need not address Kamps's claim that the court's refusal to rule on her objection to the police report and to Duronslet's hearing testimony on hearsay grounds "has no effect on this appeal" under *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [113 Cal.Rptr.3d 327, 235 P.3d 988] (*Reid*), where our high court held that when a trial court ruling on a summary judgment motion "fails to rule expressly on specific evidentiary objections, it is presumed that the objections have been overruled . . . and the objections are preserved on appeal." (*Id.* at p. 534.) We note, however, that this is not a summary judgment case and that Kamps has not cited any cases applying *Reid* outside the summary judgment context.

*Antick* stands for the proposition that a party need not make a continuing objection to a particular line of evidence once the party's initial objection to that line of evidence has been overruled. (*Antick, supra,* 15 Cal.3d at p. 95, overruled on other grounds in *People v. McCoy* (2001) 25 Cal.4th 1111, 1123 [108 Cal.Rptr.2d 188, 24 P.3d 1210]; see Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2011) ¶¶ 8:3286–8:3288, p. 8G-3 (rev. # 1, 2010).) In that case, our high court held that defense counsel preserved his objection to evidence by objecting to it during trial "when the prosecution first offered it through the testimony of [a police officer]. Indeed, cognizant of the potential prejudicial effect of this line of proof upon the interests of his client, counsel made sure that the arguments on its admissibility were held out of the presence of the jury. During this discussion, the prosecutor specifically stated that he intended to call the burglary victim as a witness on behalf of the People. Defense counsel thereafter reasserted his objection, which was overruled by the court. Once having had this issue resolved against him, defense counsel was not required to repeat his objection when the burglary victim actually testified and when the items of property were admitted into evidence. [Citation.]" (*Antick, supra,* 15 Cal.3d at p. 95.) Here and in contrast to *Antick,* Kamps did not obtain a ruling on her hearsay objection to the police report.

Kamps's reliance on *Hill* is similarly unavailing. In *Hill,* the defendant alleged the prosecutor committed prosecutorial misconduct at trial. (*Hill, supra,* 17 Cal.4th at pp. 814–815, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618].) The California Supreme Court noted, " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety' " but explained that "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile." (*Hill,* at p. 820, quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

The *Hill* court concluded the defendant preserved his prosecutorial misconduct claim for review even though trial counsel did not object to all of the instances of misconduct. (*Hill, supra,* 17 Cal.4th at p. 821.) The court explained that defense counsel "was subjected to a constant barrage of [the prosecutor's] unethical conduct, including misstating the evidence, sarcastic and critical comments demeaning defense counsel, and propounding outright falsehoods. With a few exceptions, all of [the] misconduct occurred in front of the jury. Her continual misconduct, coupled with the trial court's failure to rein in her excesses, created a trial atmosphere so poisonous that [defense counsel] was thrust upon the horns of a dilemma. On the one hand, he could

continually object to [the prosecutor]'s misconduct and risk repeatedly provoking the trial court's wrath, which took the form of comments before the jury suggesting [defense counsel] was an obstructionist, delaying the trial with 'meritless' objections. These comments from the bench ran an obvious risk of prejudicing the jury towards his client. On the other hand, [defense counsel] could decline to object, thereby forcing defendant to suffer the prejudice caused by [defense counsel]'s constant misconduct. Under these *unusual circumstances*, we conclude [defense counsel] must be excused from the legal obligation to continually object, state the grounds of his objection, and ask the jury be admonished. On this record, we are convinced any additional attempts on his part to do so would have been futile and counterproductive to his client. [Citations.]" (*Ibid.*, italics added.)

Here and in contrast to *Hill*, the hearsay Kamps challenges on appeal—Duronslet's declaration—was offered and received without objection *before* the attorney declaration was offered, which did draw Kamps's objection. There was no prior ruling that would have suggested an objection to Duronslet's declaration and its attachment would be futile. Moreover, no such "unusual circumstances" are present here. This case does not concern prosecutorial misconduct, nor any conduct in front of a jury. The atmosphere at the hearing on Duronslet's injunction was not "so poisonous" that Kamps was forced to remain silent to avoid the "trial court's wrath." (*Hill, supra*, 17 Cal.4th at p. 821.) The court did not chastise Kamps for objecting on hearsay grounds; the court simply declined to rule on the objections.

## II.

### *Hearsay Evidence Is Admissible at an Injunction Hearing Pursuant to Code of Civil Procedure Former Section 527.6*

■ Next, we reject Kamps's claim that hearsay evidence cannot satisfy Duronslet's burden to provide clear and convincing evidence of a credible threat under Code of Civil Procedure former section 527.6. Section 527.6 "appear[s] to be [a] statutory exception[] to the general rule" that "a written declaration, though it has the evidentiary force of a sworn affidavit . . . is archetypical hearsay, inadmissible at trial over objection unless allowed by special statute or stipulation of the parties." (*Malatka v. Helm* (2010) 188 Cal.App.4th 1074, 1085, fn. 5 [116 Cal.Rptr.3d 343], citation omitted (*Malatka*).) "Section 527.6, subdivision (c) expressly allows for an application for a temporary restraining order to be issued based on 'an affidavit that, to the satisfaction of the court, shows reasonable proof of harassment of the plaintiff by the defendant, and that great or irreparable harm would result to the plaintiff.' " (*Malatka*, at p. 1085, fn. 5.) Similarly, section 527.6, subdivision (d) requires the court—at the hearing on the injunction—to *"receive any*

*testimony that is relevant*" and authorizes the court to "make an independent inquiry." (Italics added.) This would seem to authorize the court to admit hearsay evidence during hearings conducted pursuant to section 527.6, subdivision (d).

*Schraer v. Berkeley Property Owners' Assn.* (1989) 207 Cal.App.3d 719, 733 [255 Cal.Rptr. 453] (*Schraer*) supports our conclusion. In *Schraer*, this court reversed the issuance of an injunction because the trial court refused to allow the defendant to present oral testimony in opposition to the injunction request. After describing the procedure to obtain an injunction under Code of Civil Procedure former section 527.6, we held, "[t]hus, if it is offered, relevant oral testimony must be taken from available witnesses, and the trial court cannot issue an injunction unless it finds, by clear and convincing evidence, that unlawful harassment already exists in fact." (*Schraer*, at p. 733.) In a footnote, we explained that at a hearing to obtain an injunction pursuant to section 527.6, "[b]oth sides may offer evidence by deposition, affidavit, or oral testimony, and the court *shall receive* such evidence, subject only to such reasonable limitations as are necessary to conserve the expeditious nature of the harassment procedure set forth by . . . section 527.6." (*Schraer*, at p. 733, fn. 6; see *Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550, 556 [133 Cal.Rptr.3d 830] [trial court properly considered hearsay evidence when deciding whether to issue a restraining order pursuant to Code Civ. Proc., § 527.8, former subd. (f), which permitted the court to "receive any testimony that is relevant" when issuing an injunction preventing workplace violence].)

We do not dispute Kamps's assertion that the police report is hearsay and that she objected to it as such, but we cannot conclude—as she urges—that the police report is the "sole evidence of Kamps's threat" against Duronslet. There was ample evidence Kamps made a "credible threat of violence" under Code of Civil Procedure former section 527.6, subdivision (b)(2). In her declaration, Duronslet averred, "Kamps told the nurse that she had a will and funeral arrangements made and that she planned to kill her neighbor and then herself." Duronslet also testified Lee called her on December 22, 2010, and told her, "based on the advice of the psychiatric liaison[,] he would be issuing an emergency protective order that would last a few days." The emergency protective order application attached to Duronslet's declaration demonstrated that "during a doctor's visit, Kamps told a nurse that she suffers from depression due to her neighbor. Kamps told [the] nurse that she was going to kill her neighbor & commit suicide." As noted above, Kamps did not object to this evidence.

Finally, we reject Kamps's contention—unsupported by a citation to the record—that Duronslet was somehow trying to "sneak in" the evidence to

force her to "concentrat[e] on finding each Trojan horse rather than on the trial." Duronslet was doing what she was authorized by Code of Civil Procedure former section 527.6 to do: offer evidence to support her injunction request. Substantial evidence therefore supports a finding that Kamps made a credible threat of violence to Duronslet within the meaning of section 527.6 and the court properly issued the restraining order. (*Schild, supra,* 232 Cal.App.3d at p. 762.)

## III.

*Substantial Evidence Supports the Trial Court's Conclusion That the Physician-patient Privilege Does Not Apply to Kamps's Conversation with the Nurse*

In the trial court, Kamps claimed her statements to the nurse—that she was going to kill Duronslet and then kill herself—were protected by the physician-patient privilege set forth in section 994. On appeal, Kamps contends the court erred by overruling her physician-patient privilege objection and by admitting evidence of her conversation with the nurse.

■ "Ordinarily, '[t]he party claiming [an evidentiary] privilege carries the burden of showing that the evidence which it seeks to suppress is within the terms of the statute.' " (*Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 441 [32 Cal.Rptr.3d 209] (*Roman Catholic Archbishop of Los Angeles*), quoting *D. I. Chadbourne, Inc. v. Superior Court* (1964) 60 Cal.2d 723, 729 [36 Cal.Rptr. 468, 388 P.2d 700].) In other words, the party claiming the privilege " 'has the *initial burden* of proving the *preliminary facts* to show the privilege applies.' [Citation.] 'Once the claimant establishes the preliminary facts [supporting the existence of the privilege] *the burden of proof shifts to the opponent of the privilege.* To obtain disclosure, the opponent must rebut the statutory presumption of confidentiality set forth in . . . section 917[, subdivision (a)],' " show the privilege has been waived, or demonstrate the communication falls within an exception to the privilege. (*Roman Catholic Archbishop of Los Angeles,* at p. 442, fn. omitted; see *OXY Resources California LLC v. Superior Court* (2004) 115 Cal.App.4th 874, 890 [9 Cal.Rptr.3d 621] (*OXY Resources*).)

"We review the trial court's privilege determination under the substantial evidence standard." (*Roman Catholic Archbishop Diocese of Los Angeles, supra,* 131 Cal.App.4th at p. 442.) " ' "When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it

[citations]." ' [Citation.] Accordingly, unless a claimed privilege appears as a matter of law from the undisputed facts, an appellate court may not overturn the trial court's decision to reject that claim. [Citation.]" (*HLC Properties, Ltd. v. Superior Court* (2005) 35 Cal.4th 54, 60 [24 Cal.Rptr.3d 199, 105 P.3d 560].)

Section 994—which codifies the physician-patient privilege—provides in relevant part, "the patient, whether or not a party, has a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and physician . . . : [¶] . . . [¶] The relationship of a physician and patient shall exist between a medical or podiatry corporation . . . and the patient to whom it renders professional services, as well as between such patients and licensed physicians and surgeons employed by such corporation to render services to such patients."

Because Kamps claims the physician-patient privilege applies to her conversation with the nurse, she had the burden to establish the existence of a physician-patient relationship, i.e., that the person she consulted was a physician within the meaning of section 990. (*Roman Catholic Archbishop of Los Angeles, supra,* 131 Cal.App.4th at p. 442, fn. 12; see generally Simons, Cal. Evidence Manual (2012 ed.) § 5:45, pp. 415–417 (Simons).) As we discuss below, Kamps has failed to make a threshold showing that the nurse to whom she communicated the threats was a "physician" within the meaning of section 990.

■ At oral argument, counsel for Kamps seemed to argue the use of the word "physician" in section 990 should include nurses and nurse practitioners. "We apply well-settled principles of statutory construction." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225].) Our task in interpreting a statute "is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs." (*Ibid.*) ■ Section 990 defines "physician" as "a person authorized, or reasonably believed by the patient to be authorized, to practice medicine in any state or nation." This definition does not encompass nurses.

Legislative history supports our conclusion. Until 1967, the physician-patient privilege was located in Code of Civil Procedure former section 1881, enacted in 1872. Code of Civil Procedure former section 1881 did not extend the physician-patient privilege to nurses. (See *Kramer v. Policy Holders Life Ins. Assn.* (1935) 5 Cal.App.2d 380, 384 [42 P.2d 665] [noting Code Civ.

Proc., former § 1881, par. (4) "contains no provision extending the [physician-patient] privilege to the nurse, secretary, stenographer or clerk of a doctor"].) That statute provided in relevant part, "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore a person cannot be examined as a witness in the following cases: . . . (4) A licensed physician or surgeon cannot, without the consent of his patient, be examined in a civil action, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient." (Code of Civ. Proc., former § 1881, par. (4).)

In 1965, the Legislature amended paragraph four of Code of Civil Procedure former section 1881 "to include professional assistants of the physician within the scope of those who cannot be examined without the consent of the patient." (*Elder v. Bd. of Medical Examiners* (1966) 241 Cal.App.2d 246, 252, fn. 9 [50 Cal.Rptr. 304].) Code of Civil Procedure former section 1881, paragraph (4), effective 1965, provided in relevant part, "A licensed physician or surgeon and his professional assistants including but not limited to his *nurse*, X-ray and laboratory technicians and pharmacists whose knowledge and information concerning the patient was acquired from or by order of the physician or surgeon cannot, without the consent of his patient, be examined in a civil action, as to any information acquired in attending the patient, which was necessary to enable him to prescribe or act for the patient . . . ." (Stats. 1965, ch. 923, § 1, pp. 2533–2533, italics added.) As the 1965 Summary Digest explained, former section 1881, paragraph (4) (as amended) "[e]xtends [the] privilege accorded [a] licensed physician or surgeon to include his professional assistants whose knowledge and information concerning patient was acquired from or by order of physician or surgeon." (Legis. Counsel's Dig., Sen. Bill No. 232 (1965 Reg. Sess.) Summary Dig., p. 27.)

At the direction of the Legislature, the California Law Revision Commission reviewed statutes "regulating the admission and exclusion of evidence before the California courts" and proposed the establishment of an Evidence Code. (Assemblyman Alfred H. Song, letter to Governor Edmund G. Brown (May 7, 1965) pp. 1–2; Governor's chaptered bill file on Assem. Bill No. 33 (1965 Reg. Sess.); see Assem. Conc. Res. No. 10, Stats. 1956 (1956 Reg. Sess.) res. ch. 42, pp. 263–265.) At its 1965 regular session, the Legislature adopted the recommendation of the Law Revision Commission, repealed Code of Civil Procedure former section 1881, and replaced it with Evidence Code section 990 et seq., operative January 1, 1967. (Stats. 1965, ch. 299, § 2, pp. 1297, 1329–1331.)

Section 990—which defines "physician" for purposes of the physician-patient privilege—has not been amended since its enactment. Two amendments to section 994, one in 1968 (Stats. 1968, ch. 1375, § 3, p. 2696) and another in 1980 (Stats. 1980, ch. 1313, § 12, p. 4532), however, "had the practical effect of expanding the definition of 'physician' to include a medical corporation and its physician employees and . . . podiatry corporations." (2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 198, pp. 463–464.) Neither of these amendments broadened the definition of "physician" to include medical staff such as nurses.

Our research has not disclosed any California authority holding a nurse constitutes a "physician" for purposes of the physician-patient privilege set forth in section 994. Kamps, however, contends "[s]tatements to nurses" are privileged under the physician-patient privilege pursuant to *Carlton v. Superior Court* (1968) 261 Cal.App.2d 282, 289 [67 Cal.Rptr. 568] (*Carlton*). In *Carlton*, the plaintiff was a passenger in the defendant's car when the car hit a dirt embankment, injuring the plaintiff. After the accident, the defendant went to the hospital "for the treatment of his own injuries." The plaintiff sued, claiming the defendant was " 'under the influence of intoxicants' " and that his " 'faculties were substantially impaired' " while he drove. (*Id.* at p. 284.)

The trial court granted the plaintiff's motion for an order permitting inspection of "records, reports and documents" at the hospital where the defendant was treated on the day of the accident. The order permitted the plaintiff to inspect " 'doctor's notes, orders and comments, x-rays, and laboratory tests . . . and including the portions of the aforesaid hospital records as made by persons other than medical doctors in connection with the original reception and any follow-up examinations regarding the intoxication of [the] defendant . . . by any medical doctors on the same date of the original reception.' " The order further provided that " 'the aforesaid inspection shall include any observations and/or tests made by medical doctors as well as any observations by any individual who are [*sic*] not medical doctors and shall include any type of laboratory tests which may indicate intoxication. Inspection of any hospital records other than relating to the intoxication or intoxicated condition of [the] defendant, . . . as ordered above, shall not be allowed or permitted, nor shall inspection be permitted of any statements made by said defendant to doctors or nurses then under supervision of doctors.' " (*Carlton, supra,* 261 Cal.App.2d at p. 285.)

The hospital refused to comply with the order and the plaintiff filed a motion to enforce the order. In response, the hospital argued it was "impossible for anyone [*sic*] person present to delineate that which was within the meaning and intent of the order without invading the" physician-patient

privilege. (*Carlton, supra*, 261 Cal.App.2d at p. 286.) The trial court determined it would review the hospital's records in camera, segregate the privileged records from the nonprivileged records, and then allow counsel to inspect the nonprivileged documents. The defendant appealed, contending the court's inspection order was in excess of its jurisdiction because the hospital records were privileged under Code of Civil Procedure former section 2031. The defendant also claimed the court did not have the power to examine the hospital records and determine which portion the plaintiff could examine. (*Carlton, supra*, 261 Cal.App.2d at p. 287.)

After reciting the physician-patient privilege set forth in section 994 and the definitions of physician and patient in sections 990 and 991, the *Carlton* court concluded, "There can be little doubt that in the case before us the relationship of patient and physician was established as between defendant and the physicians at the hospital who undertook to examine, diagnose and furnish curative treatment from the time of his arrival at the hospital until his discharge, within the meaning of these and other sections of the Evidence Code discussed below." (*Carlton, supra*, 261 Cal.App.2d at p. 288.)

Next, the court examined the "scope of the privilege in relation to the order for inspection" and held that any " 'doctor's notes, orders and comments,' as well as the records of 'any follow-up examinations regarding the intoxication of [the] defendant, . . . by any medical doctors,' and the records of 'any observations and/or tests made by medical doctors,' are well within the scope of section 992 . . . and are privileged, and that plaintiff is not entitled to inspect those records unless he has brought his case within the exception provided by section 996," which sets forth the patient-litigant exception to the physician-patient privilege. (*Carlton, supra*, 261 Cal.App.2d at pp. 288, 289.) The court noted, however, the inspection order did not permit inspection of " 'statements made by said defendant to doctors or nurses then under supervision of doctors.' " (*Id.* at p. 289.) The court then determined the patient-litigant exception did not apply—that the defendant did not tender his medical condition simply by denying the plaintiff's allegations regarding his condition on the day of the accident. (See, e.g., Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2011) ¶ 6:74.1, p. 6-33 (rev. # 1, 2010).)

Kamps's reliance on *Carlton* is misplaced. That case does not stand for the proposition that statements made to nurses fall within the physician-patient privilege. To the contrary, the court did not address that issue, having noted that the inspection order was not so broad as to encompass " 'statements made . . . to doctors or nurses then under the supervision of doctors.' " (*Carlton, supra*, 261 Cal.App.2d at p. 289.)

In some states, the physician-patient privilege specifically includes nurses and other medical personnel. (See, e.g., *State v. Raymond* (1981) 139 Vt. 464,

468 [431 A.2d 453, 455]; *Ostrowski v. Mockridge* (1954) 242 Minn. 265 [65 N.W.2d 185, 190–191] (*Ostrowski*).) For example, Vermont Statute Annotated section 1612, subdivision (a) provides in relevant part, "Confidential information privileged. Unless the patient waives the privilege or unless the privilege is waived by an express provision of law, a person authorized to practice medicine . . . or dentistry, [*or*] *a registered professional or licensed practical nurse*, . . . shall not be allowed to disclose any information [which he] acquired in attending a patient in a professional capacity, . . . and which was necessary to enable him to act in that capacity." (Vt. Stats. Ann. tit. 12, § 1612, subd. (a), italics added.) Similarly, New York's statute provides: "Confidential information privileged. Unless the patient waives the privilege, a person authorized to practice medicine, *registered professional nursing, licensed practical nursing*, dentistry, podiatry or chiropractic shall not be allowed to disclose any information which he acquired in attending a patient in a professional capacity, and which was necessary to enable him to act in that capacity." (McKinney's Consolidated Laws of N.Y. Ann. § 4504, subd. (a), italics added; see Minn. Stats. Ann. § 595.02, subd. (1)(g); Or. Rev. Stats. Ann. tit. 4, § 40.240; Or. Rule of Evidence, § 504-2 [creating a nurse-patient privilege distinct from the physician-patient privilege].) Unlike the statutes listed above, Evidence Code section 990 does not refer to nurses, nor does it include "nurses" in the definition of "physicians." The word "nurse" is not mentioned in any of the statutes pertaining to the physician-patient privilege. (See §§ 990–1007.)

Courts in other jurisdictions have reached conflicting results when considering whether the physician-patient privilege impliedly extends to nurses when the statute does not specifically mention nurses. (See generally 47 A.L.R.2d 742, § 1; 81 Am.Jur.2d (2011 supp.) Witnesses, § 429, p. 50.) Some courts have refused to extend the privilege to nurses where the statute does "not expressly include nurses within the testimonial privilege of physicians." (47 A.L.R.2d, *supra*, § 3, p. 745.) These courts seem to take the view that "[a] person is not . . . a 'physician' for purposes of the [physician-patient] privilege simply because he or she has some medical training." (The New Wigmore: Evidentiary Privileges (2010) § 6.9.1, p. 841 (The New Wigmore), citing *State v. Tatro* (1993) 161 Vt. 182, 185 [635 A.2d 1204] [chiropractors were not "physicians" for the purposes of the physician-patient privilege]; see 1 McCormick, Evidence (6th ed. 2009) § 101; *People v. Van Le* (1987) 194 Cal.App.3d 845, 849 [239 Cal.Rptr. 858] [pharmacist's illegal use of Medi-Cal cards did "not impinge on communications with a physician"].)

In other states, courts have adopted the view that a patient's statements to a nurse are privileged if the nurse is acting as an agent of the physician. (See The New Wigmore, *supra*, § 6.9.1, pp. 842–843, fn. 100, citing cases, including *Plunkett v. Ginsburg* (1995) 217 Ga.App. 20 [456 S.E.2d 595, 597] ["[t]he privilege does not extend, however, to any *communications made to*

nurses or attendants, unless they were acting as agents of the attending" doctor], *State v. Henderson* (Mo.App. 1991) 824 S.W.2d 445, 450 ["[c]ommunications made to or in the presence of a nurse may be privileged if the nurse is acting under the direction of a physician or assisting him in his treatment"], and *Cleveland v. Haffey* (Ohio Mun. 1998) 703 N.E.2d 380, 391 [privilege attaches if the nurse's purpose was the acquisition of information "to assist the physician" (italics omitted)]; see also *Ostrowski, supra,* 65 N.W.2d at p. 191.)

■ We are mindful that the physician-patient privilege is to be construed liberally in favor of the patient. (*Green v. Superior Court* (1963) 220 Cal.App.2d 121, 126 [33 Cal.Rptr. 604].) ■ We are constrained, however, by the well-established rule that "[t]he privileges set out in the Evidence Code are legislative creations; the courts of this state have no power to expand them or to recognize implied exceptions." (*Wells Fargo Bank v. Superior Court* (2000) 22 Cal.4th 201, 206 [91 Cal.Rptr.2d 716, 990 P.2d 591].) "Unlike the federal courts, '[t]he courts of this state . . . are not free to create new privileges as a matter of judicial policy and must apply only those which have been created by statute. [Citations.]' [Citations.] . . . Courts may not add to the statutory privileges except as required by state or federal constitutional law [citations], nor may courts imply unwritten exceptions to existing statutory privileges. [Citations.]' [Citation.] The area of privilege ' "is one of the few instances where the Evidence Code precludes the courts from elaborating upon the statutory scheme." [Citation.]' [Citation.]" (*OXY Resources, supra,* 115 Cal.App.4th at pp. 888–889, fn. omitted.) The approach taken by the latter group of states—those that extend the physician-patient privilege to nurses working under the supervision of a physician or as an agent of a physician—may be practical and, in some situations, advisable, particularly given the role nurses currently play in providing medical care. But we are prohibited from broadening the physician-patient privilege to extend it to medical personnel not explicitly mentioned in section 990's definition of "physician."

■ We therefore conclude Kamps did not make a threshold showing that the privilege set forth in section 994 extends to nurses where section 990 does not define "physician" to include nurse or any other medical staff. In the trial court, Kamps did not argue—or demonstrate—the nurse with whom she consulted was "licensed to practice medicine" or that she "reasonably believed" the nurse was authorized to practice medicine. We conclude Kamps did not satisfy her initial burden to provide preliminary facts to support the existence of the physician-patient privilege. Accordingly, the trial court properly determined the privilege did not apply. Having reached this result, we need not determine whether the "crime-tort" exception set forth in section 997 or the "required report" exception set forth in section 1006 applies to Kamps's threat to kill Duronslet and then kill herself.

IV.

*We Deny Kamps's Request for Judicial Notice*

Kamps has requested we take judicial notice of general information on "Nurse Practitioner Practice" apparently posted on the California Board of Registered Nursing Web site pursuant to section 452, subdivisions (b), (d), and (h) because it "defines what a nurse practitioner is and does" and "shows that such a person has some heightened psychological training, supporting the inference that any threat [she] made was not credible because, although having heightened training, the [nurse] [practitioner] did not notify the police of it." Duronslet opposes the request.

We deny the request for judicial notice. Information about nurse practitioners from the California Board of Registered Nursing Web site is not a regulation or legislative enactment "issued by or under the authority of the United States or any public entity in the United States" (§ 452, subd. (b)), nor is it a court record (§ 452, subd. (d)). In addition, we need not take judicial notice pursuant to section 452, subdivision (h) because Kamps has not provided the court with information sufficient to show the information about nurse practitioners is "not reasonably subject to dispute" and that it is "capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." (§ 452, subd. (h); *Leibert v. Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1700 [39 Cal.Rptr.2d 65] [declining to judicially notice an "unauthenticated, internal memorandum" "purportedly authored" by a deputy chief of the California Department of Industrial Relations]; see Simons, *supra*, § 7:15, pp. 551–552.)

 We deny the request for the additional reason that the information was not before the trial court. "Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.] No exceptional circumstances exist that would justify deviating from that rule . . . ." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 [58 Cal.Rptr.2d 899, 926 P.2d 1085].) In addition, Kamps has not demonstrated the material is "relevant to and helpful toward resolving the matters before this court," particularly where—as here—it is not clear whether the woman to whom Duronslet made the statements was a nurse practitioner. (*Deveny v. Entropin, Inc.* (2006) 139 Cal.App.4th 408, 418 [42 Cal.Rptr.3d 807]; see *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4 [67 Cal.Rptr.3d 330, 169 P.3d 559].)

## DISPOSITION

The order granting the injunction pursuant to Code of Civil Procedure former section 527.6 is affirmed. Duronslet is entitled to costs on appeal.

Simons, J., and Bruiniers, J., concurred.