Filed 2/27/26  Ribstein v. Marx CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| RYAN RIBSTEIN,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>MIA MARX,<br><br>      Defendant and Appellant. | B338174<br><br>(Los Angeles County<br>Super. Ct. No. 23VERO01759) |

APPEAL from an order of the Superior Court of
Los Angeles County, Karen Moskowitz, Judge.  Affirmed.

Mia Marx, in pro. per., for Defendant and Appellant.

Ryan Ribstein, in pro. per., for Plaintiff and Respondent.

_____

Mia Marx appeals from an order granting respondent Ryan Ribstein's petition for a Code of Civil Procedure section 527.6[1] civil harassment restraining order (CHRO) against her. We affirm.

## FACTUAL BACKGROUND

### A.     Alleged Fraud on Marx

Marx and Ribstein are former "business associates." Marx is also the former girlfriend of Ribstein's friend and business associate, Jonathan Yu. Marx contends that, between August 2022 and September 2023, Ribstein "transferred $165,657.13 . . . from her bank account[s] without her authorization." According to Marx, Ribstein "conspired" with Yu and another business associate, James Swink, to accomplish this. Marx learned of "the account takeover" on August 16, 2023 and "notified" various authorities, including the Los Angeles Police Department (LAPD), Department of Justice (DOJ), Federal Trade Commission, Internal Revenue Service (IRS), and Franchise Tax Board.

### B.     Ribstein's CHRO Petition

On October 17, 2023, Ribstein filed a petition for a CHRO against Marx. The petition requested protection for Ribstein, Swink, and another of Ribstein's business associates, Eric London. It alleged Marx "and her mother, Lorain Denise Rozniak Rice," were "on a vendetta against [Ribstein, Swink, and London] and ha[d] reached out to a number of business associates and colleagues disparaging and defaming them." It further alleged that Marx and her mother had "called, harassed, and physically gone to the homes of [Ribstein, Swink, and London] on repeated occasions" and

---

[1] Subsequent statutory references are to the Code of Civil Procedure.

threatened them. Ribstein also requested the court immediately issue a temporary restraining order on these bases. The court denied Ribstein's request for emergency relief and set a hearing on the permanent CHRO request.

## C. Marx's Lawsuit Against Ribstein

On October 30, 2023, the same date Ribstein served his CHRO petition, Marx filed a complaint against Ribstein asserting tort causes of action based on the allegedly fraudulent bank transfers.

Marx requested the court consolidate her lawsuit and Ribstein's CHRO petition. The court denied the request.

## D. Hearing

At Marx's request, the court required Ribstein and Marx to exchange witness and exhibit lists and serve copies of all exhibits five days before the hearing. The court's order warned the parties that failure to comply with the order could result in the court excluding evidence.

The court heard the CHRO petition on February 8, 2024, approximately three months after it was filed.

### 1. *Evidentiary Rulings Involving Marx's Mother*

Out the outset of the hearing, Marx asked the court to exclude testimony "that refers to [her] mother." Marx argued she should not be held responsible for her mother's actions. Ribstein's counsel argued that "Marx and her mother act in unison and interchangeably in harassing individuals." The court declined to exclude testimony about Marx's mother "as part of a preliminary motion," but invited Marx to object during the testimony.

3

Marx offered to provide a declaration her mother had executed. Because Marx could not prove she had served it on Ribstein, however, the court declined to consider it. Marx's mother was not present at the hearing.

### 2. *Ribstein's Evidence*

#### a. *August 17, 2023 phone call to Ribstein*

Ribstein testified that on August 17, 2023, he received a phone call from Marx's mother. He believed she "was calling [him] on behalf of [Marx]." Marx's mother "said that she had reported [Ribstein] to the [Federal Bureau of Investigation [FBI]], the [DOJ], the IRS, [and] the police department, and that [he] would get what [he] had coming." Ribstein "felt very threatened."

#### b. *August 29, 2023 phone call to Ribstein's mother*

Ribstein's mother testified that a woman identifying herself as "[Marx's] mother" had called her on August 29, 2023 saying, " 'I'm going to call the FBI, . . . the [DOJ;] [Ribstein is going to] get what's coming to [him]." Ribstein's mother felt threatened by this call, "because [Marx] and her mother had been showing up at houses and getting into houses by telling people stuff."

Ribstein testified his mother told him the caller also stated "that [Ribstein] had stolen $150,000," that "[the caller] had called the FBI[,] and that [Ribstein] was under investigation and would be going to jail." Ribstein referred to the caller as both Marx's mother and Marx herself. When the court asked for clarification, Ribstein explained: "[I]n some of the evidence we have, I don't know who it [was] directly. It could be her [(i.e., Marx)] or her mother, because it's the same person identifying themself in many

4

different ways throughout all of the harassment.  [¶] . . . [¶] . . . It's the same voice, and it's on the phone, and they've used the name Mia, they've used the name Lorraine. . . . But its all the same voice, . . . [and] they all involve [Marx] as far as the subject matter of what they're talking about."

### c.      *September 13, 2023 incident*

Ribstein played security camera footage (without audio) depicting two women he identified as Marx and Marx's mother arriving by car in front of his home, located in a gated community. The footage is approximately eight minutes long.  The two women "look[ ] at [Ribstein's] mailbox," which is on the curb, "then wander[ ] around" in the street, apparently "search[ing] for somebody to talk to," then return to their car and drive away.

Ribstein and his wife both testified that they were not home when they received an alert from the security camera showing Marx and her mother in front of the couple's house.  Ribstein believed Marx and her mother "were there to possibly speak with [him]" or that there was some "misunderstanding."  The couple decided to return home, and "as [they] were approaching [their] neighborhood [they] saw the same car [they] noticed in the video."  They "turned around" and began following the car.  Ribstein "was trying to figure out why [Marx and her mother] were there and if [Marx and her mother] wanted to talk about something."

Ribstein "pulled up next to [Marx and her mother] and asked them to pull over."  According to both Ribstein and his wife, Marx "called [Ribstein] a fat effing Jew" and told him he "would get what [he had] coming."  Ribstein called 911.  The operator advised him to stop following Marx and her mother, and he did.

5

### d. *October 30, 2023 interaction with Marx's mother*

Ribstein testified that he and Marx's mother were present when a process server served the CHRO petition on Marx. Marx's mother "came up to [him] and . . . whispered . . . 'you'll get what you have coming.'"

### e. *Phone calls to Ribstein's business associates between August and October 2023*

Ribstein testified that Marx called "several" of his business associates and friends. He identified three of these by name. First, Marx called Eric London "several times" and said Ribstein was a "fraudster" who "stole her identity." She told London that she was going to "file a claim against [London's] insurance license, which she ended up doing." Second, a man Ribstein knew only as "Sonny" told Ribstein about a call Sonny had received from someone identifying herself as "Lisa McDaniel with the LAPD" and asking about Marx. When Sonny pressed the caller for further identification, she stated she was a private investigator, and ultimately hung up on him. Ribstein believed Marx made this call. Third, in January 2024, an acquaintance named Audi Kawowski approached Ribstein at a conference and told Ribstein "Marx had been frequently calling [Kawowski]," telling him she knew he and Ribstein were friends because she had " 'seen [Kawowski] like [Ribstein's] social media comments.' "

Ribstein did not testify as to the specific dates on which Marx called these or any other of Ribstein's business associates or acquaintances. Rather, he testified generally that, from August 2023 until October 30, 2023, he was "consistent[ly]" learning of calls to business associates.

### f. *Phone calls from blocked numbers between August and October 2023*

Ribstein testified that, between August and October 2023, he received approximately 10 calls from blocked numbers "at all hours of the night" that he assumed were from Marx. He never answered any of these calls.

### g. *Need for a restraining order*

Ribstein testified that he needed a restraining order "because the only reason [the harassment] stopped is [that] . . . [Marx] was served [on October 30, 2023], but up until then it was consistent things."

Ribstein described Marx's conduct as "terrifying" and that he now worries for his wife's safety when he is not home. "[B]ecause of the stuff that was going on . . . [he] lost testosterone . . . [and] had to go on medicine for that." Ribstein described feeling like "a criminal," feeling "terrible about [him]self" and being "in a constant state of alertness." He believed Marx's conduct had harmed his business reputation as well.

### 3. *Marx's Testimony*

Marx denied much of Ribstein's version of events, including that she had made any calls to Ribstein or anyone associated with him between August and October 2023. Marx acknowledged, however, that after she and her mother learned of the allegedly fraudulent bank transfers, her mother "began doing inquiries into what these wires were for" by calling the recipients of the transfers. Marx did not participate in these calls.

Marx recalled hearing her mother receive a call from Ribstein on September 13, 2023, during which he asked Marx's mother to meet with him. Ribstein's and his wife's cell phone records do not

7

support this. Later that day, Marx and her mother drove together to Ribstein's home in Marx's mother's car. Marx denied entering the Ribstein's gated community by following a delivery truck for which the gates had opened. Ribstein impeached this testimony with a neighbor's security camera footage. Marx denied calling Ribstein a "fat effing Jew."

The court permitted Ribstein to cross-examine Marx using an audio recording in which a female voice appears to leave a voicemail message for Eric London. The court did not accept the recording as evidence, however. The female voice identifies herself as "Mia Marx." Marx testified that the voice sounded like her mother's.

### E. CHRO

The court concluded Ribstein had met his burden under section 527.6 and issued a three-year CHRO protecting only Ribstein. The order requires Marx to stay at least 100 feet away from Ribstein, his home, workplace, and vehicle. It also prohibits her from harassing Ribstein, directly or indirectly contacting him, and attempting to obtain his address or location. It prohibits Marx from possessing any firearms or ammunition. It contains an exception permitting "peaceful written contact through a lawyer or a process server or other person for service of legal papers related to a court case."

Marx timely appealed the court's order granting the CHRO.

### DISCUSSION

Marx asks us to reverse the order granting Ribstein's CHRO petition or, in the alternative, that we limit the scope of the CHRO. She argues (1) the evidence is insufficient to support the findings section 527.6 requires; (2) the conduct Ribstein alleges does not meet the section 527.6 definition of harassment; (3) the petition

8

did not give Marx sufficient notice to afford her due process; (4) the court committed various errors at the hearing; and (5) the CHRO is overbroad. On all points, we disagree.

## A.    Sufficiency of the Evidence Arguments

Section 527.6 " ' "establish[es] an expedited procedure for enjoining acts of 'harassment' ' " in order " ' "to provide quick relief to harassed persons." ' [Citation.]" (*Olson v. Doe* (2022) 12 Cal.5th 669, 677 (*Olson*).) Section 527.6 defines harassment as " 'a knowing and willful course of conduct' entailing a 'pattern' of 'a series of acts over a period of time, however short, evidencing a continuity of purpose' . . . 'directed at a specific person[,]' . . . 'which seriously alarms, annoys, or harasses the person[,]' " " 'serves no legitimate purpose,' " " 'would cause a reasonable person to suffer substantial emotional distress[,]' . . . 'actually cause[s] substantial emotional distress to the plaintiff[,]' . . . and . . . is not a '[c]onstitutionally protected activity.' " (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 (*Schild*); see § 527.6, subd. (b).)

A petitioner seeking a section 527.6 injunction must prove, by clear and convincing evidence (§ 527.6, subd. (i)) (1) "harassment" as defined by the statute, and (2) a " ' "reasonable probability" ' " that harassment will be " ' "repeated in the future." ' " (*Yost v. Forestiere* (2020) 51 Cal.App.5th 509, 527 (*Yost*).)

" '[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof.' " (*Hansen v. Volkov* (2023) 96 Cal.App.5th 94, 104 (*Hansen*), quoting *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005 (*O.B.*).)

9

### 1. *Marx's Involvement*

Marx contends substantial evidence does not support a finding by clear and convincing evidence that Marx, rather than Marx's mother acting independently, engaged in any of the offending conduct except the September 13 incident. She points to evidence supporting that Marx's mother or someone identifying herself as such made the calls at issue. The court heard conflicting testimony from Ribstein and Marx as to who was involved in these calls. It also heard Marx's testimony denying that she made the calls or instructed her mother to make the calls, and Ribstein's testimony that he believed Marx and her mother were acting in concert. The court apparently deemed Ribstein's testimony to be more credible. In reviewing for substantial evidence—even to support a finding by the heightened clear and convincing standard—"we must 'not reweigh the evidence itself' ([*O.B., supra,* 9 Cal.5th at p. 1008] . . . ), but must instead 'view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence.' " (*E.G. v. M.L.* (2024) 105 Cal.App.5th 688, 699.)

The court could also reasonably infer from other evidence that Marx's mother was acting together with Marx or at Marx's direction. For example, that Marx and her mother went together to Ribstein's home supports such an inference. That a court could have reasonably reached a different conclusion does not render the evidence insufficient. Nor do we agree with Marx's assessment that the court was confused as to whether testimony described Marx or her mother; to the contrary, the court asked Ribstein to refrain from

using the pronoun "she" and to instead clearly identify to whom he was referring.

Substantial evidence supports the court's finding that Marx was sufficiently involved in the calls, either because she was herself the caller, or because she was acting in concert with her mother.

## 2. *Probability of Future Harm*

Marx argues substantial evidence does not support the requisite " ' "reasonable probability" ' " the conduct Ribstein complains of will continue. (*Yost, supra*, 51 Cal.App.5th at p. 527; see *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 496 [harassment must be "likely to recur in the future"].) According to Ribstein's testimony—which the court deemed credible— the offending conduct only stopped when Ribstein served Marx with the CHRO petition. This suggests that, in the absence of a CHRO, it is reasonably probable the offending conduct will continue. Moreover, other evidence supports a reasonable probability that the offending conduct will continue. Namely, the " ' "circumstance[ ]" ' " that " ' "precipitat[ed]" ' " (*Yost, supra,* 51 Cal.App.5th at p. 528) the offending conduct—the dispute between Ribstein and Marx regarding the allegedly fraudulent wire transfers—continues to exist, Marx's initial filing of a lawsuit notwithstanding. This dispute was also the topic of virtually all offending communications. Thus, " 'the nature of the unlawful [harassment] evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist' " suggests " ' "it is reasonably probable" ' " these unlawful acts will continue " ' "in the future." ' " (*Ibid*.)

11

## B.     Section 527.6 "Harassment"

Marx argues the conduct Ribstein presented as harassment does not meet section 526.7's definition of the term.  " '[W]hether the facts, when construed most favorably in [petitioner's] favor, are legally sufficient to constitute civil harassment under section 527.6 . . . [is a] question[ ] of law subject to de novo review.'  [Citations.]" (*Hansen, supra*, 96 Cal.App.5th at p. 104.)  Marx notes that Ribstein did not offer any evidence of violent conduct or threats of violence.  But section 527.6 harassment does not require violence.  (See § 527.6, subd. (b)(3) [defining "[h]arassment" as either "unlawful violence, a credible threat of violence, *or* a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose," italics added]; *Schild, supra,* 232 Cal.App.3d at p. 762 [identifying elements of section 527.6 "harassment"].)  She also argues the single September 13 incident cannot alone constitute the "course of conduct" (§ 527.6, subd. (b)(3)) the statute requires.  But substantial evidence supports the court's findings that Marx was involved in and/or responsible for other offending communications as well.  A single instance of conduct was not all that was before the court.  Marx argues the calls to Ribstein's associates were constitutionally protected petitioning activity with a legitimate purpose in that they reflect efforts to gather information about the allegedly fraudulent wire transfers.  (See § 527.6, subd. (b)(1) ["[c]onstitutionally protected activity is not included within the meaning of 'course of conduct.' "]; *id.*, subd. (b)(3) [course of conduct constituting harassment must "serve[ ] no legitimate purpose"].)  But the evidence supports that the conduct went beyond investigating suspected fraud.  For example, the evidence

does not suggest the call to Ribstein's mother assisted Marx in preparing her lawsuit or served some other legitimate purpose. And nothing about Marx and her mother's visit to Ribstein's home suggests it was petitioning activity. Nor did this visit have a legitimate purpose if one accepts, as we must, Ribstein's testimony that he did not invite Marx or her mother to his home that day. And the calls to Ribstein's associates included not just questions about the transfers that might serve some legitimate purpose, but also accusations that Ribstein had defrauded others, would get what was coming to him, and would be going to jail.

Finally, we disagree with Marx that the harm Ribstein claims to have suffered does not constitute substantial emotional distress. The court credited Ribstein's testimony that he was anxious and worried about the safety of his family and maintaining the tranquility of his family home. We cannot say a reasonable person would not react in this way after Marx and her mother entered Ribstein's locked, gated community without permission and appeared at his home uninvited. Ribstein also testified that the accusations of fraud were damaging his reputation as a businessman, and that his testosterone levels had dropped. Accepting, as we must, the truth of this testimony, it provides substantial evidence of substantial emotional distress.

### C.    Due Process Arguments

" 'We review procedural due process claims de novo because "the ultimate determination of procedural fairness amounts to a question of law." [Citation.]' " (*Severson & Werson, P.C. v. Sepehry-Fard* (2019) 37 Cal.App.5th 938, 944.) Marx argues the CHRO petition was insufficiently detailed to allow her to adequately prepare, resulting in a hearing at which she was "ambush[ed]." She notes that the petition does not ask the court to include Marx's

13

mother as a restrained person, even though Marx's mother was central to Ribstein's presentation at the hearing. She also notes that the petition alleges only generally that "on multiple occasions" Marx and her mother contacted Ribstein and his business associates, yet Ribstein testified at the hearing regarding several communications on specific dates.

"[S]ection 527.6 procedures are relatively informal, proceeding by 'simple and concise' forms that parties are required to use (§ 527.6, subd. (x)(1))." (*Olson, supra*, 12 Cal.5th at p. 683.) In light of this, and given that the parties exchanged witness and exhibit lists in advance of the hearing, the truncated nature of the petition's allegations did not deprive Marx of the ability to prepare her own defense.[2]

### D. Evidentiary and Procedural Issues at the Hearing

Marx argues the court committed numerous errors during the hearing.

First, she argues the court improperly permitted hearsay evidence. But "[s]ection 527.6, subdivision (d) requires the court . . . to 'receive *any* testimony that is relevant' " and thus "authorize[s] the court to admit hearsay evidence during [section 527.6] hearings." (*Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 728-729; accord, *Yost, supra*, 51 Cal.App.5th at p. 521 ["hearsay

---

[2] Marx also argues that the petition was invalid because Ribstein's attorney, rather than Ribstein himself, signed it. But Marx offers no authority for the proposition that Ribstein's attorney could not submit the filing on Ribstein's behalf.

evidence . . . is admissible during hearings conducted pursuant to section 527.6"].)

Second, Marx contends the court prevented her from offering evidence regarding her lawsuit against Ribstein or the alleged fraud underlying it. The hearing transcript does not support this. To the contrary, it reflects the court inquiring about the status of the lawsuit for "a little bit of context," and Marx testifying that the lawsuit was "not currently" pending because she had withdrawn it with the intention of refiling in a different jurisdiction. Marx cites no instance in which she attempted to offer evidence of the lawsuit or underlying fraud, but the court declined to consider it. Rather, Marx implies that the court's pre-hearing denial of her request to relate the CHRO petition and the lawsuit limited her ability to reference the lawsuit at the hearing. But she does not explain how the two matters being related would have assisted her when the lawsuit was no longer pending at the time of the CHRO hearing.

Marx also argues the court improperly declined to permit testimony that Marx has Jewish heritage and testimony and recordings establishing that Ribstein performs stand-up comedy, during which he uses antisemitic language and references to having had fertility issues for some time. Marx argues these were relevant to impeach Ribstein's claims that the alleged harassment caused his testosterone levels to drop and that Marx using an antisemitic slur could cause him emotional distress. The court acted within its discretion in deeming these topics insufficiently relevant. (See § 527.6, subd. (i)(1); *City of Ripon v. Sweetin* (2002) 100 Cal.App.4th 887, 900 [evidentiary rulings reviewed for an abuse of discretion].)

Finally, Marx argues the court improperly placed the burden on Marx to prove she was not involved in or responsible for her mother's conduct. But the court repeatedly stated the burden of

15

proof was on Ribstein, as the petitioner, to prove harassment that is reasonably probable to continue in the future. The language Marx cites in arguing the court did otherwise appears in the context of the court denying Marx's request that all testimony regarding her mother be excluded. The court stated the burden would be on Marx to object to the testimony as it is offered during the trial. The court did not improperly require Marx to prove she did not harass Ribstein.

### E.    Scope of the CHRO

Marx argues that the CHRO is overly broad because "[s]he [can] only be enjoined from that which she has been found to have done." Marx offers no support for this contention. Section 527.6 authorizes a court, based on findings of harassment and a reasonable probability of future harm, to issue orders enjoining a long list of activities, as well as any other "specified behavior that the court determines is necessary to effectuate [such] orders." (§ 527.6, subd. (b)(6)(B).) The statute does not require the order to enjoin only activities that were part of past harassment.

Marx next argues that the CHRO will impede her ability as a self-represented litigant to pursue her lawsuit against Ribstein. But Marx characterized conduct the court found to be harassing as efforts to pursue that lawsuit as well. The court thus did not act outside the scope of its discretion in declining to make an exception to the CHRO for such efforts—particularly when, at the time of the hearing, no lawsuit was pending.

The exception in the CHRO for "service of legal papers" is sufficient to permit Marx to refile and serve her lawsuit, as she represented to the court she intends to do. After doing so, with a lawsuit pending, the issue of whether additional exceptions to the CHRO are necessary will be ripe, and Marx may file a petition

16

asking the court to amend the CHRO as necessary to allow Marx to pursue her civil lawsuit representing herself.

## DISPOSITION

The order is affirmed.  The parties shall bear their own costs on appeal.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:


BENDIX, J.


M. KIM, J.

17